MONTGOMERY WARD & CO., Incorporated, Plaintiff,

v.

The NORTHERN PACIFIC TERMINAL COMPANY OF OREGON, Great Northern Railway Company, Spokane, Portland and Seattle Railway Co., Northern Pacific Railway Company, Union Pacific Railroad Company, Southern Pacific Company, Railway Express Agency, Incorporated, F. D. Hartwick, doing business as Nehalem Valley Motor Freight, Gustave Robertson, doing business as Robertson Freight Lines, L. C. Hall, doing business as L. C. Hall's Truck Line, Walter Haney, doing business as Haney Truck Lines, L. M. Slocum, doing business as Independent Motor Transport, Albert C. Pounder, doing business as Pounder Truck Service, A. D. Bourbonnais & Herman Schwab, doing business as S & M Truck Line, O. L. Moore, doing business as Sherwood Truck Service, Jesse U. Stout, doing business as Spokane-Pacific Line, T. M. Stewart, doing business as Stewart Truck Line, Emil Jossy, C. R. Jossy & Chester O. Knowlton, doing business as Tillamook-Portland Auto Freight, Frank Bentley & M. M. Hix, doing business as Woodburn Truck Line, L. H. Wright, doing business as Wright Truck Line, J. W. McCracken & E. E. McCracken, doing business as McCracken Bros. Motor Freight, C. R. & Cullen Y. Baker, doing business as Baker Truck Lines, Arthur W. Lee & George V. Eastes, doing business as Lee & Eastes Auto Freight, H. F. & A. J. Martin, doing business as Martin Transfer Company, O. H. Weeks & R. R. Weeks, doing business as Weeks Company Transfer, Earl T. Whiting, doing business as Whiting Truck Service, E. H. Cooper, doing business as Whiting Truck Service, Lenus F. Boys, doing business as Woodland Truck Line, Bend-Portland Truck Service, Inc., Columbia Truck Express, The Dalles Freight Line, Inc., Pacific Seaboard Motor Lines, Inc., Pacific Truck Express, Pierce Auto Freight Lines, Inc., Portland, Astoria, Seaside Auto Freight, Inc., Portland-Pendleton Motor Transport Company, Rand Truck Line, Inc., Reddaway's Truck Line, Silver Wheel Motor Freight, Inc., Smart's Auto Freight Co., Inc., Oregon Express, Oregon-Nevada-California Fast Freight Inc., System Freight Service, Chaney Freight Line, Inc., Garrett Freight Lines, Inc., Consolidated Freightways, Inc., Pacific Highway Transport, Inter-

---

state Freight Lines, Inc., United Truck Lines, Inc., Battle Ground Truck Service, Cater Motor Freight System, Inc., North Bank Truck Line, Inc., Sunrise Trail, Inc., O. & W. Transit Company, Portland-Seattle Auto Freight, Inc., Inland Motor Freight, Defendants.

**Civ. A. No. 1686.**

United States District Court,
D. Oregon.

June 30, 1953.

See, also, 128 F.Supp. 520, 17 F. R.D. 52.

Stuart S. Ball, John A. Barr, David L. Dickson, William L. Niemann, Chicago, Ill., and Stephen Parker, Portland, Or., for Montgomery Ward & Co.

Roy F. Shields, Joseph Berkshire, Portland, Or., Dean H. Eastman, Seattle, Wash., for Northern Pacific Terminal Co. of Oregon.

Charles A. Hart, Portland, Or., Clark A. Eckart, Seattle, Wash., for Great Northern Railway Co.

Charles A. Hart, Fletcher Rockwood, Portland, Or., Dean H. Eastman, Clark A. Eckart, Seattle, Wash., for Spokane, Portland & Seattle Ry. Co.

Charles A. Hart, Portland, Or., Dean H. Eastman, Seattle, Wash., for Northern Pac. Ry. Co.

Roy F. Shields, Joseph G. Berkshire, Portland, Or., for Union Pac. R. Co.

Clarence J. Young, Portland, Or., for Southern Pac. Co.

Borden Wood, Grant T. Anderson, Portland, Or., for Railway Express Agency.

John M. Hickson, Portland, Or., for F. D. Hartwick and others.

C. O. Fenlason, Portland, Or., for Gustave Robertson.

William P. Ellis, Portland, Or., for Albert C. Pounder and others.

Leonard D. Alley, Portland, Or., for Emil Jossy and others.

C. E. Holbrook and Donald A. Schafer, Portland, Or., for Consolidated Freightways, Inc.

JAMES ALGER FEE, Chief Judge.

This opinion will concern itself with long dead events. The passions and emotional stresses which brought these about have lost their flame. In the interest of the public and the nation, it may be assumed that never again will the employer, the unions and the carriers be enmeshed in such a train of events. These circumstances must be reviewed to determine only whether there is legal responsibility for the situation and, if so, whether damages shall be allowed against the carriers jointly or against any one of them alone. It is the essence of the judicial process to perform such a function dispassionately under the law.[1]

The great difficulty is to bring the facts into any compass of succinct statement. The attorneys in the case accomplished a monumental work, after conferences extending over years, by bringing to the Court for signature a pre-trial order wherein all except a minute part of the evidentiary facts were agreed upon within some thirty-six hundred pages.[2] As a result, the evidence in the case was taken in nine trial days. Inasmuch as informed estimates of the length of trial were stated as from eighteen months to two years, the lightening of the judicial load is apparent. When it is appreciated that the result was accomplished by examinations, tabulation and calculation of tariffs, connect-

---

1. At a time when only minor progress had been made toward liberalism in labor policies and toward the interaction of administrative bodies and courts in the field, this Court denied an injunction prayed for by a labor union against consideration of a controversy by a newly created Regional Labor Relations Board. The Court said: "The genius of our institutions is indifferent to the political developments in other countries. A thoroughly American solution is attempted, by collective bargaining, varying neither to the right nor to the left, nor destroy-

ing the liberties or property rights engaged upon either side." National Lumber Workers Union v. Tidewater Timber Company, April 30, 1934. This desired consummation has been delayed, but developments in the area indicate it was sound prophecy.

2. The pre-trial order contained in all over thirty-five hundred pages of agreed facts and schedules, and one hundred additional pages dealing with the issues of fact and law raised by the parties.

ing rates, history of shipments, plotting of mercantile and carrier operations, investigations into labor relations and the history of particular incidents, besides innumerable other factors, the magnitude of the task begins to take form. Many years of arduous work by the leading counsel for the carriers and the company in taking depositions, fixing statements of fact which all counsel could agree upon, and then making changes required to make them acceptable to opposing counsel required devotion hardly conceivable. The issues of law and fact which remain to be settled are included in the order, as well as the contentions which each of the respective parties make thereto.

The problem of the Court is to reduce these multitudinous facts and issues into a reasonably short and understandable opinion.

The facts in barest outline follow:

Wards was engaged in the business of general merchandising through mail order houses and retail stores located at various points in the United States. Its establishment at Portland, Oregon, consisted of a mail order house and a retail store in the same building. The Portland plant was dependent upon common carrier service, local drayage, parcel post, water and other transportation service, before and during the period involved, to carry on the regular course of its business at Portland. This action is brought against line-haul rail carriers, Terminal Company, line-haul motor carriers and Railway Express alone.

Each of the line-haul rail carriers operated an interstate line of railroad extending to Portland. Track connections were maintained with other rail carriers there. Terminal Company, a subsidiary of these line-haul railroads, operated an extensive system of terminal yards and tracks connecting with those of the line carriers. It operated on spur tracks serving various industries and establishments, under contracts of twenty-five years' standing with these carriers, which gave Terminal Company the right to perform switching service for most of the area and all such service for Zone 1 North, which included Wards. Before the period here involved, carload shipments and other bulky articles or large lots were transported across the Portland area by rail and were delivered to or received from Wards through that company on one of three spur industry tracks. Each of these crossed a public street before it ended on Wards' property. The line-haul carriers each included in their respective tariffs rates for service on ingoing and outgoing parcels between the carrier's freight depot and the place of business of the shipper or consignee in an area which included Wards' establishment in Portland. This service, commonly called "pick-up and delivery," provided for acceptance of goods at the shipper's plant and transportation across the Portland area to the facilities for line-haul and also provided for transportation of goods addressed to a consignee across the Portland area and delivery at its place of business. Such tariffs provided that the shipper or consignee, at its option, might receive a fixed fee if it performed these services itself.

Each of the motor carrier defendants was a common carrier of freight by motor vehicle, authorized to transport general commodities to and from Portland, operating under either a permit issued by the Public Utilities Commissioner of Oregon or a certificate issued by the Interstate Commerce Commission, or both.

The motor carrier defendants had been carrying a substantial amount of Wards' goods in line-haul before the occurrences in question here. The burden of pick-up and delivery service, as above described, by Railway Express and by each motor carrier defendant was accepted in their respective tariffs.

Wards' loading facilities were limited. Contracts were in force between one Robertson and Wards for transportation of freight between the line-haul carrier depots and the establishment. Each line-haul rail carrier and most motor carriers had arrangements with Robert-

son for such pick-up and delivery because of positive notification from Wards that this was desired.

Before December 7, 1940, a labor dispute arose between Wards and a large number of employees at its Portland plant. On that day a strike was called by a clerks' union and a warehousemen's union, both of which were composed of employees of this merchandising concern and were affiliated with the American Federation of Labor. There was a lull until negotiations broke down on December 20, 1940. A picket line, however, was maintained throughout the strike period covering all street entrances, facilities for motor vehicles and openings for switch tracks.

The warehousemen's local above mentioned was connected with the general Teamsters Union. The latter had another affiliate, members of which were drivers and operators of motors and which was a transport union exclusively. The transport union held closed shop contracts with practically all the motor carriers in the Portland area. The labor executives connected with the Teamsters devised a plan of total prohibition of transportation and handling of Wards' goods in that area and all supplies for its plant and of preventing access to the facilities of commerce, state and national, for goods going out of the plant and transportation and delivery of goods transported in commerce to the plant. The scheme was to be carried out by placing unfair lists, procuring employees of other firms and concerns to take concerted action to refuse to handle or to transport Wards' goods, or to receive from or deliver goods to Wards. In order to keep away from public disapproval, which had been visited on some labor leaders connected with and members of these unions not long before, orders were given that there should be no violence, but concurrence was to be obtained by the familiar methods called "peaceful" in the argot of many adherents. One of these was the cancellation of membership of anyone belonging to this transport union who failed to carry out these directions and objectives. Another was the picketing of the carriers' establishments and houses of suppliers for handling Wards' goods.

All but five of the line motor carrier defendants received goods or had goods tendered to them for delivery to Wards' Portland establishment either in interstate or intrastate commerce just before and during the strike period. Wards would have delivered to the line-haul motor carriers sufficient freight for their capacity during the strike. However, on most of the motor carriers, Wards made only one formal demand in mass upon the 13th day of December, 1940. The reason for this was that the motor carriers from the beginning were impressed with the idea that they must go along with the union leaders. A few of them sent trucks to Wards for the purpose of entering the plant. The drivers of these vehicles on the ground in line of duty for these carriers made no attempt to cross the picket line and returned to their respective depots. There was no attempt of any line-haul motor carrier defendant to carry any of Wards' freight across the Portland area except in line transit. None of the motor carriers, by their employees, made a determined effort to serve Wards. A few of the drivers who refused to serve Wards were discharged but reinstated under pressure.

The major motor carriers had agreements in similar form with Local 162, the operators and drivers union connected with the Teamsters, which contained the clause:

"It is understood that the Union is not in favor of sympathetic strikes, and will do everything in its power to prevent them during the life of this agreement. It is also understood and agreed that movements of freight in interstate commerce, or in intrastate commerce insofar as affects shipments from city to city, over lines of the Operator operating under certificates or permits issued by Federal or State authority or under jurisdiction of

the Interstate Commerce Commission shall not be subject to interference."

Their agreements ran for a fixed time, which ended March 1, 1941.

The motor carriers were threatened with boycott and strikes of the motor carriers' employees if Wards' goods were handled. In instances, picket lines were threatened if the suggestions were disregarded, and in a few cases were actually posted.

Such a barrier was threatened to be set up around Robertson's depot because of its local pick-up and delivery of Wards' goods under contract for transport across the Portland area for delivery to Wards as consignee or at the facilities of the line carriers in intrastate and interstate commerce. Robertson ceased handling Wards' goods except surreptitiously. This agency of both type carriers was not replaced by them or another substituted.

A picket line was set up at the establishment of Pierce Auto Freight Lines, Inc., because Wards' goods were handled by the carrier. Thereupon, the employees of Pierce, members of the transport union, walked off and refused to return until Pierce promised the union leaders "to do better." Whereupon, the picket line was withdrawn. Wards' goods were thereafter handled by Pierce only under cover of fictitious bills of lading even in line-haul transit. Many of the motor carriers also cooperated in this way. Thereupon, contrary to the plain letter of their contracts with the transport union, upon which they had been vociferously insisting, most of the motor carrier defendants, at meetings of their league, actually consented to go along with the illegal boycotts and isolation of Wards from transportation except for shipments under some form of concealment. No one of them insisted effectively that the interpretation of a clause be submitted to arbitration, although the unions had expressly agreed to this action in their separate contracts. In fact, the carriers deliberately failed to issue a call for a joint meeting to negotiate concerning the arbitration stipulation.

The union leaders violently repudiated the stipulation for arbitration, and the motor carriers jointly continued in the combination which had the sequestration of Wards as its major purpose. Prior to March 1, when their agreements with the transport union containing these clauses would have expired, the members of the Motor Carriers League negotiated new contracts with the transport unions, which contained a stipulation amending the clause set out above, as follows:

"It shall not be a violation of this agreement for an employee to refuse to go through a picket line established by a bonafide A. F of L. Union."

To the end of the period, in accordance with this scheme, the motor carriers joined hands with the union leaders, through their employees with the acquiescence of the executives, to insulate the plaintiff's Portland establishment from all means of conveyance of its goods, incoming or outgoing, through the area.

During this time, each of the line rail carriers received goods for delivery to Wards in carload lots, less than carload lots and in individual shipments in interstate commerce and from points in the State of Oregon. No delivery was made of any of these until after the strike ended.

Wards had on the floor at all times during the strike merchandise which it would have delivered to each of the line railroads, either in carload lots, less than carload lots or pick-up for transportation in interstate commerce under the filed tariffs. Of this the rail carriers were well aware. Terminal Company made some attempts to switch cars out of Wards' plant. None of these was carried out after December 23, when there was an opera bouffe scene. The action was dramatic, but marked by unreality. There was a show of force by the pickets. To this Terminal Company and the line-haul rail carriers yielded. The agents and representatives of such carriers in

line of duty, the switch crew on the ground, did not in good faith attempt to carry out the switches.

There was no riot or general disturbance at the plant or elsewhere. Some sporadic acts of violence occurred around Wards' establishment and a few connected with the difficulty at a distance. Only a negligible number of these were directed at an employee of a rail carrier. The employees of the railroad took the position that they refused to go through the picket line unless they could do so safely without breach of the peace, and of this they were to be the judges. These employees of the rail carriers were neither in the same business, type of business or connected concern with Wards or its employees, nor did they belong to the same or any affiliated union or group of unions with the strikers or the union leaders controlling the strike, the boycott and the picketing.

Thereafter, the switch engine and crew were sent by Terminal Company to some locality on a switch track in the vicinity of Wards' Portland establishment at least once a day during the entire period of the strike. The local police were not called during the period by the rail carriers on the occasion above mentioned, or any other. However, police appeared but refused on one occasion to take any action unless Wards promised to swear out complaints against all who were arrested. When this was accomplished, the officers did at times attempt to break down the more or less passive resistance and obstruction of the picket line. But the switch crew, who were the representatives of the rail carriers in line of duty, did not cooperate with the local officers, and as a result their efforts were unavailing.

At this point, an executive of one of the rail brotherhoods, a union which had control over the recalcitrant employees of Terminal Company, took action in concert with the striking merchandising employees and the motor transport operators by ratifying the action of Terminal Company in failing to cooperate with the local police. This prevented further action by Terminal Company, which took this excuse for inaction. The railroad executives had joint sessions, in which the inaction of Terminal Company, the failure to transport Wards' goods in the Portland area, the repudiation of the rail carriers' obligations, and the failure to cooperate with the local police were given acquiescence. The railroad executives also tacitly approved the failure of Robertson to pick up and deliver at Wards and to transport the goods from and to their facilities in commerce. Neither Robertson nor Terminal Company was replaced as an agency for transportation in the area, acceptance or delivery of Wards' shipments. There were other minor incidents related to switching, but they are of the same character. The Court finds that the approach of the switch crew to Wards during practically all the rest of the strike period was a futile gesture, since all parties concerned were in agreement that no attempt in good faith would be made to serve the plant, and that, upon the appearance of the pickets on the line, the switch crew would withdraw. This was the uniform course of events.

This cooperation by the Terminal Company employees in line of duty lasted throughout the strike and was acquiesced in by the Terminal Company and the line carriers. As a result, no switch was completed from December 25, 1940, until after July 26, 1941, when the pickets were withdrawn. There was an attempt by the unions to prevent any handling of goods of Wards at the freight houses of the line carriers. These freight houses were picketed by the transport unions which had contracts with the motor carriers. The rail employees respected such lines. In this situation, the rail carriers issued a document which indicated they would handle Wards' goods in main line haul or in preparation for diversion in transit to other points, but not otherwise, and the picket lines were withdrawn. These incidents had an unquestioned effect, however, in persuading the management to assist in the boycott and isolation of Wards.

These actions by the unions and acquiescence by the defendants acting in concert with them were successful. No line-haul rail carriers made any effort to give service of any kind to Wards' Portland establishment by motor vehicle after December 7, 1940, or by rail after December 25, 1940, excluding the collusive action of Terminal Company's switch crew. No effort was made by Railway Express to serve Wards through their regular motor vehicle service after their employees refused to cross the picket line. No motor carrier, here defendant, made any effort directly to give service to Wards after refusal of the truck driver employees to handle Wards' goods or to go into the plant.

There is no evidence that any carrier handled any article in local transportation after December 25, 1940. There is no evidence that the truckers moved a pound of freight toward Wards' Portland establishment. They did not transport the goods to the vicinity of Wards' premises and unload them as requested. The employees of the motor carriers did not place their refusal to move freight out of their own depots on the ground that the picket line was at the plant, but on the ground that the boycott was in effect and that the union would renounce them if they moved any such goods. The railroad crews did not bring any cars and leave them on the public street for Wards to unload if it could, nor make any such offer, nor move any freight or supplies for Wards through the Portland area except in handling for through transit to other points. No deliveries were made at the plant or acceptance of goods from the plant by any defendant as a line carrier after December 25. As mentioned above, there was minor handling of goods surreptitiously.

Besides the incidents above outlined, the union leaders had Wards declared unfair by The Central Labor Council, the Oregon State Federation of Labor and Joint Council 37 of the Teamsters Union, which meant Wards was to be boycotted by the members. Boycotts were imposed by them against all those handling Wards' goods, against certain establishments supplying Wards with commodities or equipment, against all persons or businesses transporting Wards' goods and against certain concerns to require them to boycott a carrier transporting Wards' goods. Whereupon, many private businesses refused to deal with the carrier. In some instances, these outside and unconnected establishments were picketed because of some action which the union leaders decided might be of benefit to Wards. However, the strikers and union leaders did not interfere to any appreciable extent with the public trading at Wards' retail store located in the same building. They were, however, successful in stopping most intercourse between Wards and all the business concerns of the whole Portland area. The major oil companies ceased under pressure to sell oil to the plant.[3] The longshoremen refused because of the boycott to load on freight cars destined for the Portland establishment goods which arrived at docks in the area by ship. The local drayage concerns in general did not serve Wards' establishment during the period.

Certain government agents either refused to assist in resisting the union leaders or took action unfavorable to Wards. The local representative of the Interstate Commerce Commission was requested to assist the operators of line trucking services and refused to do so, saying that "they could not take sides." After April 1, the United States Post Office refused to deliver per day more than the amount of parcel post which Wards had received before the strike. As a result, the packages piled up in the local post office without delivery. The same governmental department re-

3. The defendants describe the oil companies as being "scared". This expression characterizes their own attitude. For, while the oil companies had no obligation to the public and to Wards, each of the carrier defendants did have, as the opinion demonstrates. Par. 376(e), "D" Appendix to defendants' opening brief.

fused to accept for posting more than the average amount Wards had delivered to it daily before the strike.

As a result of its isolation from transportation, Wards closed its establishment on May 3, 1941, but the strike continued.

Commencing May 16, 1941, Wards had petitioned the Interstate Commerce Commission, in a series of filings, for an order requiring twelve of the motor carriers to cease and desist from discrimination against its Portland establishment by failure and refusal to pick up and deliver goods. Warehousemen's Local 206, Transportation Union 162 and other affiliates of the Teamsters Union, A. F. of L., intervened. Hearings were had and testimony was taken July 10, 11 and 12, 1941.

On July 26, 1941, all the pickets had disappeared. The railroads commenced switching service through Terminal Company, and all the carriers resumed pick-up and delivery service to the Portland establishment, which reopened and attempted to re-establish normal operation.

The carriers filed motions to dismiss the proceedings of the Commission on the ground that such proceedings were moot on August 18 and 22. Wards resisted for the reason that a determination was required as a precedent.

The primary examiner of the Interstate Commerce Commission, who heard the witnesses, held that there was no violence which prevented delivery by the motor carriers, and that no relation to labor required their refusal, that their obligation as common carriers required them to render such service and recommended the order be granted. It was also indicated that the Commission still had jurisdiction notwithstanding the full compliance of the motor carriers involved. Exceptions were filed to this report. On December 1, 1942, a division of the Interstate Commerce Commission overruled the motions to dismiss. On May 10, 1943, Division 3 filed a report dismissing the complaints. The decision and the discussion hinged upon no other

questions than the labor relations of the motor carriers with their own employees and with the strikers.

Some months after the close of the strike, the National Labor Relations Board decided that Wards had been guilty of unfair labor practices as to its own employees in the dispute before the strike, and entered an order to cure the situation. On February 13, 1943, the Court of Appeals for the Ninth Circuit, National Labor Relations Board v. Montgomery Ward & Co., 133 F.2d 676, 146 A.L.R. 1045, in an appropriate proceeding, entered decree enforcing this order.

Wards brought actions against certain steamship companies for failure to deliver at the plant cargo carried by them, in which substantially the same items of damage were set up as here. These cases went to judgment of dismissal for failure to prosecute or were voluntarily dismissed.

In the instant action, Wards did not sue all the local draymen or all the motor carriers who were in a position to serve it but did not. Some of these were first joined in this suit and thereafter dismissed. Wards has amended the complaint and may have changed the theory of action in some respects. However, the agreed pre-trial order now contains all the contentions of the parties.

The Court had jurisdiction of a common law action based upon diversity of citizenship and jurisdictional amount. All the elements of such a cause of action are alleged in the complaint and specifically claimed by Wards in the pre-trial order. Jurisdiction of each of defendants was obtained by appropriate service and general appearance and diversity is admitted.

The debate here has nothing to do with the jurisdiction of the Court over the persons or subject matter. It relates instead to the law to be applied. But whether the common law of England with regard to common carriers for hire in the public interest be applied to the facts here because adopted by

the State of Oregon by constitutional convention, acts of its legislature and decisions of its courts, subject to specified modifications and limitations imposed by the paramount authority of the Congress, or the same common law of England be applied because assumed to be in existence by the federal statutes, subject to the same specific modifications and limitations, is a matter of supererogation.

All that need be known is that any spurious obligation to refuse to serve one shipper, or consignee of goods in the hands of the carrier, while holding itself out to serve the public, and all shippers, upon equal terms, is void by definition. This is true whether greed, fear or the dictates of the government motivate the refusal. For we deal here with obligations to the people, absolute when voluntarily assumed, and not with motives claimed to justify repudiation. The interest of the public, not that of the parties, is transcendent.

Now, at common law a carrier was obligated to accept and transport all commodities which it had held itself out to transport for hire,[4] whenever such commodities were tendered to or accepted by it, on nondiscriminatory terms.[5] No one was bound to invest himself with these duties and obligations to the public. Such assumption created a status[6] monopolistic in character. Voluntary entry into this state gave to the carrier the sovereign power of carrying on the King's Highway for hire and other well known special privileges and prerogatives.[7] Correlative obligations were also of the essence of the status. The duty was a public office or trust,[8] conferred by the government as a franchise, accepted by the carrier voluntarily, and enforced for the public benefit. The common carrier was charge-

4. "The true principle of a carrier's being answerable is the reward." Gibbon v. Paynton, 4 Burr. 2298, 2302, 98 Eng.Rep. 199, 201 (1769) by Aston, J. Street says early cases which distinguish between common carriers and others uniformly place strict liability on grounds of payment of reward. II Foundations of Legal Liability 305 (1906). Niagara v. Cordes, 1858, 21 How. 7, 22, 62 U.S. 7, 22, 16 L.Ed. 41.

5. "He is, in general, bound to take the goods of all who offer, * * *." Niagara v. Cordes, supra note 4. "At common law, railroad carriers are under a duty to serve all persons without unjust or unreasonable advantage to any." Hewitt v. New York, N. H. & H. R. Co., 1940, 284 N.Y. 117, 29 N.E.2d 641, 643. Jackson v. Rogers, 2 Show.K.B. 327, 89 Eng.Rep. 968 (1695).

6. "The obligations are thus the involuntary ones of a legal status—not the defined ones of a specific assumption." Wyman, The Inherent Limitation of the Public Service Duty to Particular Classes, 23 Harv.L.Rev. 339, 352 (1910). "The status and relative position of the carrier and shipper render * * * void * * * abdication of the essential duties of his employment * * *." New York Central Railroad Co. v. Lockwood, 1873, 17 Wall. 357, 380–381, 84 U.S. 357, 380, 21 L.Ed. 627.

7. "* * * on the faith of their profession of readiness so to serve ask for and obtain parliamentary powers." Clarke v. West Ham Corporation, 2 K.B. 858, 878 (1909). "* * * are endowed by the State with some of its sovereign powers, such as the right of eminent domain, and so endowed by reason of the public service they render." Western Union Telegraph Co. v. Call Publishing Co., 1901, 181 U.S. 92, 100, 21 S.Ct. 561, 564, 45 L.Ed. 765. "Corporations for carrying are created for the public good, and powers and privileges are given them in consideration of the benefits they are expected to confer upon the public." Galena & Chicago Union Railroad Co. v. Rae, 1857, 18 Ill. 488, 490.

8. "* * * that duty is a public trust, which having been conferred by the State and accepted by the corporation may be enforced for the public benefit; * * *." People v. New York Central Railroad Co., 1883, 28 Hun., N.Y., 543, 553. "He is in the exercise of a sort of public office, and has public duties to perform, * * *." New Jersey Steam Navigation Co. v. Merchants' Bank of Boston, 1848, 6 How. 344, 382, 47 U.S. 344, 382, 12 L.Ed. 465; York Co. v. Central Railroad, 1865, 3 Wall. 107, 112, 70 U.S. 107, 112, 18 L.Ed. 170. "The obligation * * * is * * * so partaking of a fiduciary character as to re-

able according to the "custom of the realm."[9] He could not refuse the duty incumbent by virtue of the public employment,[10] for he was bound to serve all the people so far as his engagement extended.[11] "This rule is a politick establishment contrived by the policy of the law for the safety of all persons, the necessity of whose affairs oblige them to trust these sorts of persons that they may be safe in their ways of dealing." Lord Holt, Coggs v. Bernard, 2 Ld. Raymond 909.[12]

The carrier could set the time and frequency of journeys and designate the places where he would accept and deliver goods.[13] Whether these details were expressly specified or fixed by customary practice, they were then and are now called the "holding out" of the carrier. But the three essentials of the status so voluntarily assumed were acceptance, transportation and delivery to consignee.[14] The fact that goods were to be transported should be brought home to the carrier by "request" for the service.[15] But the requirement was satisfied by notifying him that the shipment was at an accustomed place for acceptance. Carrying the goods the full length of the designated route was essential. Delivery to the consignee at an accustomed or specified point was an obligation which stood on an equal footing with acceptance and carriage.[16]

quire the utmost fairness and good faith on its part in dealing with the shipper and in the discharge of its duties to him * * *." Chicago & Eastern Illinois Railroad Co. v. Collins Produce Co., 1919, 249 U.S. 186, 193, 39 S.Ct. 189, 190, 63 L.Ed. 552.

9. "By the general custom of the realm, a common carrier insures the goods, at all events: and it is right and reasonable that he should do so: * * *." Gibbon v. Paynton, supra note 4, at 2301, by Yates, J.

10. Cannot "refuse to do the duty incumbent upon them by virtue of their public employment." Lane v. Cotton, 1 Ld.Raymond 646, 652, 91 Eng.Rep. 1332, 1335 (1701).

11. "* * * as far as the employment extends; * * *." Lane v. Cotton, supra note 10, at 1336. Garton v. Bristol and Exeter Railway Company, 1 B & S 112, 121 Eng.Rep. 656 (1861). Clarke v. West Ham Corporation, supra note 7, at 877. "He is bound to receive and carry all the goods offered for transportation, subject to all the responsibilities incident to his employment, * * *." New Jersey Steam Navigation Co. v. Merchants' Bank of Boston, 1848, 6 How. 344, 382, 47 U.S. 344, 382, 12 L.Ed. 465. Louisville & Nashville Railroad Co. v. Cook Brewing Co., 1912, 223 U.S. 70, 83, 32 S.Ct. 189, 56 L.Ed. 355.

12. Quoted in Atlantic Coast Line Railroad Company v. Riverside Mills, 1911, 219 U.S. 186, 205, 31 S.Ct. 164, 55 L.Ed. 167.

13. At common law, the practice and customary dealing of the carrier set the limits of its obligation. A striking instance of this was the duty to accept goods tendered for carriage, "his wagon not being full." A modern parallel illustrative of current modes of procedure was an operating rule of the carrier limiting livestock shipments to one train a week. Bodine & Clark Livestock Commission Co. v. Great Northern Railway Co., 9 Cir., 63 F.2d 472. This limitation was approved by the Commission as reasonable. "It seems to me undeniable, that a carrier may select the particular line or description of business in which he engages * * *." New Jersey Steam Navigation Co. v. Merchants' Bank of Boston, supra note 11, 47 U.S. at page 416.

14. "* * * it is the common law duty of the carrier to receive, carry, and deliver goods; * * *." Wabash Railroad Co. v. Pearce, 1904, 192 U.S. 179, 187, 24 S.Ct. 231, 233, 48 L.Ed. 397. "* * * under the legal duty to accept and transport * * * and co-extensive with the duty to transport is the duty to deliver. * * * each is an integral part of transportation." Bruskas v. Railway Express Agency, Inc., 10 Cir., 1949, 172 F.2d 915, 918.

15. At common law, a verbal demand suffices to place upon the carrier the duty to accept and transport freight. Bell v. Norfolk Southern Railroad Co., 1913, 163 N.C. 180, 79 S.E. 421.

16. "The undertaking of the carrier to transport goods necessarily includes the duty of delivering them. * * * No obligation of the carrier : * * * is more strictly enforced." North Pennsylvania Railroad Co. v. Commercial Nat. Bank of Chicago, 1887, 123 U.S. 727–734, 8 S.Ct. 266, 269, 31 L.Ed. 287. "The duty

For breach of any of the three duties imposed in the public interest and defined in detail by the "holding out," the common law gave a remedy. The penalty for failure was drastic. Liability for breach was almost absolute.[17] Justification for failure was confined to acts of God or of the enemies of the King.[18] Overweening force beyond power of the carrier to resist did not excuse damage, loss or inability to deliver to consignee.[19] The actions of the servants of the carrier were his actions. For their negligence, willfulness or de-

of a common carrier is to transport and deliver safely." Bank of Kentucky v. Adams Express Co., 1876, 93 U.S. 174, 181, 23 L.Ed. 872. "* * * charged with the duty of delivering them * * *." Galveston, Harrisburg & San Antonio Railway Co. v. Wallace, 1912, 223 U.S. 481, 492, 32 S.Ct. 205, 207, 56 L.Ed. 516. "* * * to convey the shipment to its destination and make delivery to the consignee * * *." Union Pacific Railroad Co. v. Spano, 1936, 99 Colo. 47, 59 P.2d 75.

17. "* * * held responsible as an insurer * * *." Garside v. Trent and Mersey Navigation, 4 T.R. 581, 582, 100 Eng.Rep. 1187, 1188 (1792). "* * * it is as a bailee that his liability as insurer arises, binding him to answer for the goods delivered to him at all events." Clarke v. West Ham Corporation, supra note 7, at 877, Justice Holmes, Common Law, 180, 181 (1888), suggests that "this strict responsibility is a fragmentary survival from the general law of bailment. * * *" Street, II Foundations of Legal Liability 302 (1906) is in accord: the liability of the carrier is "a survival from that period when all bailees were held strictly liable as debtors." "The rule of the common law which treated a common carrier as an insurer grew out of a situation which required that kind of security for the protection of the public." Atlantic Coast Line Railroad Company v. Riverside Mills, 1911, 219 U.S. 186, 205, 31 S.Ct. 164, 170, 55 L.Ed. 167.

18. "The law charges this person thus intrusted to carry goods, against all events but acts of God and of the enemies of the King." Coggs v. Bernard, 2 Ld.Raymond 909, 918, 92 Eng.Rep. 107, 112 (1703), by Lord Holt. "* * * is liable for all losses, and in all events, unless he can prove that the loss happened from the act of God, or the public enemy, or by the act of the owner of the goods." Niagara v. Cordes, supra note 4, 62 U.S. at page 22. See also New Jersey Steam Navigation Co. v. Merchants' Bank of Boston, 1848, 6 How. 344, 381, 47 U.S. 343, 381, 12 L.Ed. 465; Bank of Kentucky v. Adams Express Co., supra note 16; Adams Express Co. v. Croninger, 1913, 226 U.S. 491, 509, 33 S.Ct. 148, 57 L.Ed. 314. The rule was the more drastic ·in that it required the carrier not only to prove affirmatively that failure to perform was caused by an act of God or the public enemy, but also that the carrier could not by due diligence have avoided the consequence. United States Express Co. v. Kountze Brothers, 1869, 8 Wall. 342, 75 U.S. 342, 19 L.Ed. 457; see Pennsylvania Railroad Co. v. Olivit Brothers, 1917, 243 U.S. 574, 37 S.Ct. 468, 61 L.Ed. 908, dealing with a cause excepted by the bill of lading.

19. "For though the force be never so great, as if an irresistible multitude of people should rob him, nevertheless he is chargeable * * * for else these carriers might have an opportunity of undoing all persons that had any dealing with them, by combining with thieves, etc., and yet doing it in such a clandestine manner, as would not be possible to be discovered." Coggs v. Bernard, supra note 18. "The act of God is natural necessity, * * * and is distinct from inevitable accident." Trent and Mersey Navigation v. Wood, 4 Dougl. 286, 99 Eng.Rep. 884, 886 (1785). "If one delivers goods to a common carrier to convey and the carrier is robbed of them, still he shall be charged, because he has hire for them and thus impliedly undertakes to deliver the goods turned over to him; and for this he shall answer the value of them if he be robbed." Woodleife v. Curties, 1 Rolle Abr. 2. "The common law subjects the common carrier to insurance of the goods carried, except as against the act of God or public enemies. The civil excepts, also, losses by means of *any* superior force, and any inevitable accident." New York Central Railroad Co. v. Lockwood, 1873, 17 Wall. 357, 376, 84 U.S. 357, 376, 21 L.Ed. 627. Appropriation by military authorities was held to be no defense to an action brought by the shipper to recover for the loss of the goods confiscated. Chicago & Eastern Illinois Railroad Co. v. Collins Produce Co., 1919, 249 U.S. 186, 39 S.Ct. 189, 190, 63 L.Ed. 552.

fault, he was liable.[20] Their timidity or collusion in the face of violence gave him no immunity. The common law with reason feared the inability of one who had entrusted goods to another for distant delivery to prove the insidious motives of employees of the latter and ended by placing responsibility on the common carrier. As the old books say:

> "But to prevent litigation, collusion, and the necessity of going into circumstances impossible to be unravelled, the law presumes against the carrier * * *."[21]

This instant case shows the employees of the carrier are subject to the same influences today, and this rule has not lost its foundation in current situations.

Thus one of the foundation stones of progress here has been the adoption of the common law, including this absolute obligation placed upon common carriers of goods in the public interest. Developed in the darkness of the middle ages in a feudal society, when the cart was the usual means of conveyance over "traces" bogged with rain and at times impassable in snow, where the carter was liable to be levied upon by outlaw baron and plundered by fantastic "road agents," the status created in the public interest, with its indifference to saint or sinner,[22] official or tradesman, has survived in modern law because of its equality of treatment to all who offer goods for carriage for a specified con-

20. "The common-law principle making the common carrier an insurer is justified by the purpose to prevent negligence or collusion between dishonest carriers or their servants and thieves or others, to the prejudice of the shipper, who is, of necessity, so remote from his property, when in transit, that proof of such collusion or negligence when existing, would be difficult if not impossible." Chicago & Eastern Illinois Railroad Co. v. Collins Produce Co., supra note 19. 39 S.Ct. at page 193. "That these engineers were guilty of willful, rather than negligent, failure of duty cannot change the fact of liability * * *." Central Railroad & Banking Co. v. Georgia Fruit & Vegetable Exchange, 1893, 91 Ga. 389, 395, 17 S.E. 904, 906. "Whether [they] * * * were cowards shivering with fear * * * or were thieves at heart * * * their employer must suffer * * *." Lang v. Pennsylvania Railroad Co., 1893, 154 Pa. 342, 347, 26 A. 370, 2 L.R.A. 360. "The company is liable for the frauds and negligence of its agents * * * [although acting from] bribery, or from motives of partiality or oppression * * *." Galena & Chicago Union Railroad Co. v. Rae, supra note 7, 18 Ill. at page 490. "The employee is the alter ego of the principal, and any act of the employee in violation of the common law, or of the statute, is the act of the principal, for which the principal is liable." Burgess Bros. Co., Inc. v. Stewart, 1921, 114 Misc. 673, 187 N.Y.S. 873, 877. As a corollary, it is held that carriers cannot stipulate for immunity from liability for the negligence of their servants. United States v. Atlantic Mutual Ins. Co., 1952, 343

U.S. 236, 239, 72 S.Ct. 666, 96 L.Ed. 907; Adams Express Co. v. Croninger, 1913, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314. "That a common carrier cannot exempt himself from liability for * * * negligence * * * of his servants is elementary." 226 U.S. at page 509, 33 S. Ct. at page 153.

21. Lord Mansfield, using this language in Forward v. Pittard, 1 T.R. 27, 33, 99 Eng. Rep. 953, 956 (1785), held a carrier liable for goods destroyed by fire, brushing aside the argument that the carrier was liable only for his own default or that of his servants.

22. "* * * he can make no discrimination between persons, or vary his charges from their condition or character." York Co. v. Central Railroad, 1865, 3 Wall. 107, 112, 70 U.S. 107, 112, 18 L.Ed. 170. Cf. "* * * all individuals have equal rights both in respect to service and charges. * * * that principle of equality does forbid any difference in charge which is not based upon difference in service, * * *." Western Union Telegraph Co. v. Call Publishing Co., 1901, 181 U.S. 92, 100, 21 S.Ct. 561, 564, 45 L.Ed. 765. It is the clear legal duty of the carrier to receive and transport goods "of any member of the public who may tender them for carriage." Swayne & Hoyt v. Everett, 9 Cir., 1919, 255 F. 71, 74, holding the carrier liable for the refusal of his agent to accept freight for shipment, although the carrier showed that plaintiff had been blacklisted as one who aids the enemy by the British government.

sideration between specified points in accordance with the holding out of the carrier. While the carrier might limit the holding out quite narrowly as to detail, in the public interest the obligation to serve each upon equal terms without discrimination was vital. So it has remained.

■■■■■■ Wards then bases its right to recover on these common law duties and obligations. In a diversity case, a United States court sits as a court of the state and applies the law of the forum, except where controlled by federal law. This attitude is the more fitting in this case, since only local concerns of a merchandising establishment were involved at the outset. The carriers in this jurisdiction were governed by the common law principles just outlined, which exist here in full force because the State of Oregon, by its Constitution, laws and decisions, had adopted them. These principles then control all the incidents of the local situation and intrastate transportation except as it may affect interstate commerce. But the principles have a much broader effect. At the time of adoption of the common law by the state, all lawyers assumed there was a body of law which was ascertainable and was applied by all courts, state and national, with minor variations, of which these obligations of common carriers were a part. The winds of doctrine have shifted this position. But more emphasis has been thereby placed upon law locally adopted, in which such obligations were inherent.

This basic assumption also controlled the growth of the great carrier systems, railroad and motor, in this country. Therefore, the economic power of the United States is based upon these obligations of common carriers. The commerce clause of the Constitution was adopted in the light of their importance. The suggestion that these obligations have been abrogated or essentially modified by statute law or policy is unthinkable. In the preservation of these obligations, the public at large—not any class or clique—is vitally concerned. Indeed, the nation will not long survive their destruction.

■■■■■ Congress has acted upon this assumption of an ascertainable body of common law,[23] including principles of carrier liability. The original Interstate Commerce Act and its subsequent amendments and addenda are unintelligible unless viewed in the bright daylight of this customary law.[24] Yet we have now pro-

---

23. "All this [i. e., the common law of carriers] was matter of common knowledge, and upon this the legislation in respect to duties was enacted." Wabash Railroad Co. v. Pearce, 1904, 192 U.S. 179, 188, 24 S.Ct. 231, 234, 48 L.Ed. 397, discussing an act of Congress not pertinent here. Under Swift v. Tyson, 1842, 16 Pet. 1, 41 U.S. 1, 10 L.Ed. 865, the federal courts acted upon the theory that all courts in this country applied common law, but that in the federal court it was applied with an eye to the maintenance of a consistent national development of the doctrines. Cf. Western Union Telegraph Co. v. Call Publishing Co., 1901, 181 U.S. 92, 102, 21 S.Ct. 561, 45 L.Ed. 765. See also United States v. Standard Oil Co. of Cal., 1947, 332 U.S. 301, 308, 67 S.Ct. 1604, 1608, 91 L.Ed. 2067, in which Justice Rutledge discusses the contemporary existence of a " 'federal common law' ".

24. "* * * nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies; * * *." This language was included in the original statute, Feb. 4, 1887, c. 104, Part I, § 22, 24 Stat. 387, and when the last amendment was added, Sept. 27, 1944, c. 423, 58 Stat. 751, 49 U.S.C.A. § 22.

"That proviso was added at the end of the statute, * * * to preserve all existing rights which were not inconsistent with those created by the statute. It was also intended to preserve existing remedies, such as those by which a shipper could, in a state court, recover for damages to property while in the hands of the interstate carrier; damages caused by delay in shipment; damages caused by failure to comply with its common law duties, and the like. * * * the Commerce Act, in giving rights of action in Federal courts, was not intended to deprive the state courts of their general

gressed so far that competent lawyers can argue that the ancient obligations of the common carrier to the public have been destroyed. But the necessities of the people for a dependable transportation system, based upon unchanging duties of those engaged therein, has not passed away. The avowed purposes of each of the congressional enactments were to protect the individual members of the public from abuses and discrimination practiced by the carriers for their own purposes and profit. It is true, originally, combinations of capital perverted the carriers.[25] The very things complained of here are claimed to spring from a dis-crimination practiced against an individual shipper by a carrier. The purpose of Congress has not been to abrogate but to enhance protection against discrimination. It is true, the carriers are placed under a rigid system of control, but this is for the purpose of effectuating and not weakening protection of the public.[26]

 The express purpose of the Motor Carriers Act, which was placed in effect just previous to this boycott engineered by the motor transport unions, was to bring these forms of interstate transportation into one national system by regularizing and unifying the obligations.[27] Each of the carriers by motor

and concurrent jurisdiction. Galveston Harrisburg & San Antonio R. Co. v. Wallace, 223 U.S. 481, 32 S.Ct. 205, 56 L.Ed. 516.

"Construing, therefore, §§ 8, 9, and 22 in connection with the statute as a whole, it appears that the Act was both declaratory and creative. It gave shippers new rights, while at the same time preserving existing causes of action. It did not supersede the jurisdiction of state courts in any case, new or old, where the decision did not involve the determination of matters calling for the exercise of the administrative power and discretion of the Commission; or relate to a subject as to which the jurisdiction of the Federal courts had otherwise been made exclusive. Compare Abilene Case [Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.], 204 U.S. [426], 439–446, 27 S.Ct. 350, 51 L.Ed. [553], 558–561; Robinson v. Baltimore & Ohio R. Co., 222 U.S. 506, 32 S.Ct. 114, 56 L.Ed. 288, 36 Stat. 551, [49 U.S.C.A. § 15], chap. 309, Comp.Stat. 1913, § 8583; 38 Stat. 220, chap. 32." Pennsylvania Railroad Co. v. Puritan Coal Mining Co., 1915, 237 U.S. 121, 129–130, 35 S.Ct. 484, 487, 59 L.Ed. 867. "* * * this provision is not intended to nullify other parts of the act, or to defeat rights or remedies given by earlier sections, but to preserve all existing rights not inconsistent with those which the act creates." Pennsylvania Railroad Co. v. Sonman Shaft Coal Co., 1916, 242 U.S. 120, 124, 37 S.Ct. 46, 47, 61 L.Ed. 188. Central New England Railway Co. v. Boston & Albany Railroad Co., 1929, 279 U.S. 415, 420, 49 S.Ct. 358, 73 L.Ed. 770; Hewitt v. New York, N. H. & H. R. Co., 1940, 284 N.Y. 117, 29 N.E. 2d 641; Artic Roofings, Inc., v. Travers, 1943, 3 Terry, Del., 293, 32 A.2d

559 (common law liability of motor carriers preserved).

25. See Carman & Syrett, II A History of the American People 95–101 (1952).

26. "That the act to regulate commerce was intended to afford an effective means for redressing the wrongs resulting from unjust discrimination and undue preference is undoubted. Indeed, it is not open to controversy that to provide for these subjects was among the principal purposes of the act." Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 439, 27 S.Ct. 350, 355, 51 L.Ed. 553. "The Interstate Commerce Act of 1887, 24 Stat. 379, was enacted by Congress to prevent interstate railroad carriers from * * * unjustly discriminating between persons and localities." Railroad Commission of State of Wisconsin v. Chicago, Burlington & Quincy Railroad Co., 1922, 257 U.S. 563, 582, 42 S.Ct. 232, 235, 66 L.Ed. 371. "The effect of the statute was not to establish a new cause of action against the carrier, but to provide a more certain remedy for the shipper." Strachman v. Palmer, 1 Cir., 1949, 177 F.2d 427, 430, 12 A.L.R. 2d 687. "* * * 'the provisions * * * prohibiting unjust and unreasonable charges and unjust discrimination are merely declaratory of the common law.'" Hewitt v. New York, N. H. & H. R. Co., supra note 24, 29 N.E.2d at page 643.

27. "* * * to the end of developing, coordinating and preserving a national transportation system by water, highway, and rail * * *." Act September 18, 1940, c. 722, Title I, § 1, 54 Stat. 899, 49 U.S.C.A. note preceding section 301. "* * * the provisions of sections * * * 22 of this title shall apply to

here involved had been under common law obligations before the statute took effect. Like their precursors in England who assumed onerous obligations for the inestimable privilege of use of the King's Highway in carrying goods for hire, so in the public interest the modern motor carriers are permitted to use highways maintained and constructed by the people of the State of Oregon and the other states at enormous annual expense. Their rights to operate were recognized under the so-called "grandfather" clauses. The contention that they were burdened only by obligations expressly set out in the Act is contrary to law and history. The Motor Carriers Act, 49 U.S.C.A. § 301 et seq., was an amendment which was supported by the foundations of the original statute.

The Congress has never shown a disposition to destroy these original remedies or to repudiate the common law of the respective states relating to carriers. The common law remedies for breach of the obligations thereof were preserved by positive mandate, and the statutory remedial devices were made additions thereto. Thus countenance was given to

the basic substantive principles then prevalent in the state systems and nationally observed in the public interest. The constant course of legislation has reiterated the common law responsibility of the carriers. It still subsists.[28] If a contrary legislative intention can be rationalized from preambles or history or debates over the statutes, it is well to bring such an interpretation into the open so that the implication may be expressly repealed. This Court does not find such intention existed.

As a corollary to the specious axiom that all liabilities and duties of carriers are expressly spelled out in the federal statutes or the obligations do not exist,[29] the defendants apparently assume that the Interstate Commerce Commission was given primary jurisdiction over all controversies between carrier and shipper.

Even under the federal statutes now in existence, the Interstate Commerce Commission was given no authority to hear or decide a cause of action pursued in the form of a common law remedy.[30] It was given no power to

---

common carriers by motor vehicles subject to this chapter." Interstate Commerce Act, § 217(b), 49 U.S.C.A. § 317(b). "The purpose and effect of this [Motor Carrier] Act is not different from that of the Interstate Commerce Act, 49 U.S. C.A. § 1 et seq., and the decisions under the latter Act are applicable." Travers v. Artic Roofing, Inc., 1942, 3 Terry, Del. 41, 27 A.2d 78, 80.

28. The modern common law authorities retain the same structure of rights and duties of common carriers. Chicago & Eastern Illinois Railroad Co. v. Collins Produce Co., supra note 8; Atchison, T. & S. F. Ry. Co. v. Jarboe Livestock Commission Co., 10 Cir., 1947, 159 F.2d 527, 529; Bruskas v. Railway Express Agency, Inc., supra note 14; Louisiana Southern Ry. Co. v. Anderson Clayton & Co., 5 Cir., 1951, 191 F.2d 784, 785; Union Pacific Railroad Co. v. Spano, supra note 16; Hewitt v. New York, N. H. & H. R. Co., supra note 5; see cases cited infra note 30.

29. The cases which give specious ground for the contention of defendants that no

jurisdiction remains in the common law courts are of three types: (1) Cases where the state court is attempting to apply provisions of a state statute. (2) Cases where there is an endeavor to use as a basis of decision a rule of law of a particular state which is not in conformity to the uniform common law rules adopted by the Commerce Act. (3) Cases involving carrier policy which by the Act must be primarily or exclusively adjudicated by the Commission.

30. " * * * as the ground of relief sought by complainants * * * is the performance by defendants of a duty imposed upon them by law, which they wholly neglect and refuse to perform, * * * such question is one for the determination of the courts." Danciger v. Wells, Fargo & Co., C.C.1907, 154 F. 379, 382. "The Interstate Commerce Act, as adopted and thereafter amended from time to time, never purported to exclusively confine the field of jurisdiction to the Interstate Commerce Commission, but as a matter of fact was cumulative and actually reserved to the shipper and carrier all

award damage against any carrier for breach of the common law duty to receive goods for shipment upon proper request [31] or to transport or deliver goods shipped at destination.[32] The Commission was given no authority to consider a cause involving the tort of joint action by several carriers to assist one of them to breach its duty to receive, transport or deliver a particular shipment or shipments. The Commission was given

power to consider specified violations of the statutes and technical questions requiring expert knowledge and skill.[33] It was given no authority to determine questions of labor relations of any sort or the construction of tariffs or clauses of bills of lading, and no power to award reparations against any motor carrier.

The carriers contend that the "holding out" was modified by certain statutes, both federal[34] and state. The Court

common law and statutory remedies not repugnant to its provisions. [Citing § 22 of the Act.] * * * The Motor Carrier Act of 1935 specifically recognized the rights preserved under the foregoing section." Union Transfer Co. v. Renstrom, 1949, 151 Neb. 326, 37 N.W.2d 383, 386. See Hewitt v. New York, N. H. & H. R. Co., supra note 24, 29 N.E.2d at page 644–645, for a discussion of when, in an action for damages, a prior resort to the Commission is required. The Commission has no jurisdiction to entertain an action based upon common law; generally, the Commission and the federal courts have concurrent jurisdiction to award damages for a violation of the Act; see Roberts, I Federal Liabilities of Carriers § 316 (2d Ed., 1929). See cases cited infra notes 31, 32.

31. "The state and Federal courts had concurrent jurisdiction of such claim against an interstate carrier without a preliminary finding by the Commission." Pennsylvania Railroad Co. v. Puritan Coal Mining Co., supra note 24, 237 U.S. at page 134, 35 S.Ct. at page 489; United States & Interstate Commerce Commission v. Pennsylvania Railroad Co., 1916, 242 U.S. 208, 37 S.Ct. 95, 61 L.Ed. 251; Hines v. Henaghan, 4 Cir., 1920, 265 F. 831; Powers v. Cady, D.C., 1925, 9 F. 2d 458; Acme Brick Co. v. Chicago, Rock Island & P. R. Co., 5 Cir., 1950, 186 F.2d 125.

32. "But damage caused by failure to deliver goods is in no way traceable to a violation of the statute * * *." Hence a state court was held to have jurisdiction of the cause rather than the Interstate Commerce Commission. Galveston, Harrisburg & San Antonio Railway Co. v. Wallace, 1912, 223 U.S. 481, 490, 32 S.Ct. 205, 206, 56 L.Ed. 516. "* * * jurisdiction [of the Interstate Commerce Commission] over claims for reparation does not extend to claims arising from loss, damage, or delay in transit; * * * such claims are cognizable in the courts." Gustafson v. Michigan Central R. Co., 1921, 296 Ill. 41, 129 N.E. 516, 517, cer-

tiorari denied 1921, 256 U.S. 698, 41 S. Ct. 538, 65 L.Ed. 1177. "* * * no administrative question is presented." Turner, Dennis & Lowry Lumber Co. v. Chicago, Milwaukee & St. Paul Railway Co., 1926, 271 U.S. 259, 262, 46 S.Ct. 530, 531, 70 L.Ed. 934. See also Atlantic Coast Line Railroad Company v. Riverside Mills, 1911, 219 U.S. 186, 31 S.Ct. 164, 55 L.Ed. 167.

33. The Court, in Louisville & Nashville Railroad Co. v. Cook Brewing Co., 1912, 223 U.S. 70, 32 S.Ct. 189, 56 L.Ed. 355, discussing the Abilene Cotton Oil case, supra note 26, stated: "The question there was one of the reasonableness of a rate. * * * That there might be uniformity in rate-making necessarily required a resort to that body as a basis for a common-law recovery of an excessive charge." 223 U.S. at page 84, 32 S.Ct. at page 192. "* * * for the preservation of the uniformity which it was the purpose of the Act to regulate Commerce to secure, the courts may not as an original question exert authority over subjects which primarily come with [sic.] the jurisdiction of the Commission." Texas & Pacific Railway Co. v. American Tie & Timber Co., Ltd., 1914, 234 U.S. 138, 146, 34 S.Ct. 885, 888, 58 L.Ed. 1255.

34. The defendants cite various Acts which they indicate have changed the common law obligations of carriers. Particular stress is laid upon the Carmack Amendment of 1906, 49 U.S.C.A. § 20. But it has been uniformly held that this legislation did not change the common law right of a shipper to recover against an intermediate or terminal carrier whose action actually caused the loss. Strachman v. Palmer, 1 Cir., 1949, 177 F.2d 427; Goliger Trading Co. of New York v. Chicago & N. W. Ry. Co., 1950, 7 Cir., 184 F.2d 876; Louisiana Southern Ry. Co. v. Anderson Clayton & Co., 5 Cir., 1951, 191 F.2d 784; Pennsylvania R. Co. v. Musante-Phillips, Inc., D.C., 1941, 42 F.Supp. 340.

498

recognizes these enactments and gives them force so far as applicable. But there is a much broader claim to the effect that the holding out is modified (1) by the national transportation policy of the United States, (2) by the national labor policy of the United States, and (3) by carrier labor agreements, interpretations thereof and working rules or principles.

The terms of the "holding out" are questions of fact. These are affected, of course, by the applicable statutes. If it is contended that the transportation policy of the United States means anything more than the common law of carriers, as modified, regularized and unified in operation by federal statutes, in the public interest the Court can give it no recognition.

■ The labor policy of the United States cannot be conceived to authorize setting aside obligations of others by illegal acts of unions or labor leaders.[35] It cannot authorize violence or threats of violence,[36] picket lines for political purposes,[37] "secondary"[38] and "tertiary" boycotts to isolate a single business from the facilities of commerce, or combinations of unions and labor leaders with business concerns such as the railroads and motor truck operators through their respective employees on the ground in line of duty to accomplish any such illegal purposes.

The labor policy of the United States, as exemplified in Oregon, has been of a most liberal character. All encouragement has been given to the unionization of labor and of the advertisement of grievances by picketing and the economic pressure of strike. The people have encouraged all manifestations of recognition of freedom of the individual from onerous economic restraints, even at great personal inconvenience to themselves. The courts have lent support to this program.

■ But, on the other hand, there is no jurisdiction in which abuses of these privileges have been so sternly rebuked and none where crimes and oppression of labor leaders have been more quickly suppressed due to the force of law and public opinion.[39] The public is always to be considered in these disputes between labor and capital.

■■ The holding out, whether by rail or motor carrier, was not and could not legally be conditioned by any contracts which any of the carriers may have had with its own employees. Working rules or principles within the economy of the carrier would not be permitted to modify its vital obligations. Inadequacy of preparation of any carrier to carry out its engagement for hire made in the

35. National Labor Relations Board v. Sands Manufacturing Co., 1939, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; Markham & Callow, Inc., v. International Woodworkers of America, Lumber & Sawmill Workers Union, 1943, 170 Or. 517, 135 P.2d 727.

36. Allen-Bradley Local No. 1111, United Electrical, Radio & Machine Workers of America v. Wisconsin Employment Relations Board, 1942, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154.

37. See American Communications Ass'n, C. I. O. v. Douds, 1950, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925.

38. Carpenters & Joiners Union of America, Local No. 213 v. Ritter's Cafe, 1942, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143.

39. There were prosecutions for acts claimed to have been done in connection with labor disputes in the following cases: State v. Reynolds, 1939, 160 Or. 445, 86 P. 2d 413; State v. Estabrook, 1939, 162 Or. 476, 91 P.2d 838; State v. Rosser, 1939, 162 Or. 293, 86 P.2d 441, 87 P.2d 783, 91 P.2d 295. Many like cases in which the court proceedings have not been reported were prosecuted in the state courts during this period. As a result of popular reaction to these and other incidents in labor disputes, the people of Oregon, in November, 1938, by considerable majorities, enacted so drastic an anti-picketing law proposed by initiative petition that the Supreme Court of the State was compelled to hold it unconstitutional. American Federation of Labor vs. Bain, 1940, 165 Or. 183, 106 P.2d 544, 130 A.L.R. 1278.

public interest might result in the surrender or cancellation of its franchise, but not in a modification of the fundamental duties. Any conditions of this sort would have been illegal.

The rationale of this claim as to the limitation of the "holding out" is that the carriers are released from these duties outlined above, since the acts and omissions were those of its own employees over which it had no control because the latter indicated a sympathetic disposition not to handle or transport Wards' shipments. If followed, this theory will revolutionize the present economic structure. A group of transportation employees can bring all the rail and motor systems to a standstill by refusing to transport articles destined for another country with which the group disagrees.[40] The same ends can be obtained by a picket line dedicated to that end, which transportation workers will not cross. These are not theories, but pragmatic present day problems. Foreign policy, governmental action, political action and the extinction of private businesses can be controlled by collusive interaction of employees of carriers with outside and unconnected organizations.

The contention, if adopted, would destroy the representation of the employer by his employees dealing with the public or individuals in another line of business. It would wipe out the corporate theory.

 The carriers were each responsible for the acts and defaults of their own servants on the ground and in the course of employment. The common law of Oregon included the doctrine of respondeat superior. Furthermore, the servants of a common carrier in the discharge of regular duties bind the master by acts in line of duty although not only unauthorized but expressly forbidden. The responsibility does not cease although the servant may have been actuated by purely personal motives, such as profit, malice or fear.[41] It has been noted above that apprehension of collusion and secret dealings by the carriers were the reasons for the imposition of absolute liability. The common law, as adopted in Oregon, required that the loyalties and obligations of the employee of the carrier run to it, not to some outside or alien authority. In dealing with the world, the railroad or motor carrier is a person. Its servants' acts are its acts.[42] Any other ruling would change the basic structure.

40. Instances of such activity on the part of labor organizations are numerous. For example, in 1939 it was alleged in a complaint that a picket line was established in protest of the loading of scrap iron for shipment to Japan because of sympathy with the cause of China; the loading of the ship was halted because longshoremen recognized the picket line and refused to cross it. This cause was eventually dismissed. See Waterfront Employers of Portland v. Port of Astoria, United States District Court for the District of Oregon, Civ. 98 (1940, Judge McColloch). At the inception of the present war in Korea, it was charged that there was a grave threat that west coast waterfronts could be tied up for the purpose of impeding the loading of ships bound for the zone of hostilities. For a reference to these charges, see United States v. Bridges, D.C., 1950, 93 F.Supp. 989, 991, reversed by the Court of Appeals for the Ninth Circuit, 184 F.2d 881. Incidents of picketing or boycott by labor for objectives which con-

cern political and international affairs are continually noted in the press. An example of an apparent embargo of transportation between Hawaii and the mainland is suggested in the background of Hawaiian Pineapple Co., Ltd. v. International Longshoremen's & Warehousemen's Union, D.C., 1952, 107 F.Supp. 805, 811.

41. The servants of a common carrier abandoned the train because of the cold, and, as a result, the carrier failed to pick up a shipment of cattle. The defendant was held liable. "If a carrier may, through its agents and servants, abandon its duty 'because of the cold' in this climate, the service of a common carrier would become too uncertain for all practical purposes." Rittman v. Missouri Pacific Railway Co., 1914, 184 Mo.App. 424, 426, 171 S.W. 8. See also Lang v. Pennsylvania Railroad Co., supra, note 20.

42. In an action against a carrier for failure to transport goods because of the

The transportation employee, rail or motor, is charged with duties to the industry, to the shipper and to the public. The loyalty of the employee to the carrier, rail or motor, is inherent in his job, just as loyalty to the government prevents interruption of the public business in federal employment. The acts of transportation employees, both rail and motor, in the course of employment, even in repudiation of the basic obligations of the carrier, are the acts and omissions of the employer.[43]

The line-haul carriers were here not in the first instance dealing with their own respective employees, but with independent agencies, such as Robertson and Terminal Company. This circumstance makes their cooperation the more reprehensible.

It is illegal, since the statutes, both state and federal, sanction the obligation of common carriers, for any person to interfere with the carrying out of such duties. It would be illegal for a carrier, by its operating practices, to attempt to limit the holding out or to make such an attempt by agreement with its own labor.

It is now necessary to apply these concepts of common law to the complaint. Perhaps it may seem anomalous to consider the sufficiency of that document at this stage of the case. But challenges were made thereto by motions to strike, motions to make more definite and motions to dismiss—all of which the Court reserved.

In view of the foregoing resumé of the common law and the statutory modifications, the Court finds the original complaint and the complaint as amended each stated a cause of action as to each defendant. The amendments did not essentially change the basic theory of Wards upon which insistence has been laid through all the proceeding and which was included in the contentions of the

---

43. action of its employees, the Court said: "A corporation acts only through its officers and employes, and it is through them only that its action can be restrained or compelled. * * * Especially is this true with respect to employes of common carrier corporations subject to the interstate commerce law. They are fully identified with their employer in the discharge of its public functions." Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., C.C., 1893, 54 F. 730, 742–743. "The law cannot force any man to remain in the service of the public, but he has certain obligations when engaged in public service and is bound by public statutes as well as his employer." Burgess Bros. Co., Inc. v. Stewart, 1920, 112 Misc. 347, 184 N.Y.S. 199, 207, affirmed, 194 App.Div. 913, 185 N.Y.S. 85. "Individuals and unions who accept employment in public service enterprises must govern themselves accordingly and recognize that their rights and duties are somewhat different from those of men engaged in purely private businesses." Davenport Hotel, Inc. v. Consolidated Freight Lines, Inc., 27 Washington P.U.R. 15, affirmed Consolidated Freight Lines, Inc., v. Department of Public Service, 1939, 200 Wash. 659, 94 P.2d 484. See also In the Matter of Western Union Telegraph Co., 1949, 299 N.Y. 177, 86 N.E.2d 162.

43. The engineers of a rail carrier did not join in a strike of other employees of the company, but "made only a pretense of performing the service for which they were employed * * *." It was held, " * * * the company is responsible for their conduct while acting as its servants. * * *" Central Railroad & Banking Co. v. Georgia Fruit & Vegetable Exchange, supra, note 20. 17 S.E. at page 905. In a case of peculiar interest, * * *, one of the defendants was permitted to discharge an employee, who was a motor driver, for failure to carry out the duties of his position. It was said there as to motor drivers, "They represent the carrier in its relations with the public and the carrier is responsible for their conduct in the line of duty. As a common carrier of passengers, respondent is charged with the utmost skill, care and diligence consistent with its business." National Labor Relations Board v. Union Pacific Stages, Inc., 9 Cir., 1938, 99 F.2d 153, 175. "Holding to that employer, so engaged in this great public undertaking, the relation they did, they owed to him and to the public a higher duty than though their service had been due to a private person." Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., C.C., 1893, 54 F. 746, 752.

final pre-trial order. Definiteness and clarity have been attained by the admissions of fact and the issues of fact and law now before the Court.

 In dealing with this cause of action, it is well to dispose of certain technical contentions of the carriers. There is no necessity of bringing a separate complaint against each carrier based upon shipments upon which individual liability is claimed. All contentions as to responsibility arose out of the same transaction and joinder was permissible. Besides, there are allegations of joint action of defendants which are sufficient to obviate the objection. There are pointed contentions by defendants that the claims are multifarious, and that, as to each shipment as to each defendant, there should be a separate statement as to delay thereof. Defendants misconceive the gist of these claims. Reliance is not placed on delay or the contract on any particular item, but on the allegations and contentions that each defendant singly and defendants jointly failed and refused to receive, transport and deliver shipments according to obligations imposed upon each by the status of a common carrier in the public interest, which each had voluntarily assumed for hire

and profit and in consideration of other special privileges accorded it thereby.

 As a matter of procedure, if a cause of action is stated against a defendant, nonjoinder of a nonessential party is not a defect. Here, neither adjective rules nor substantive law required plaintiff to join or retain as a party any individual or entity whom it did not wish to charge, or it could not prove, acted jointly with a defendant. This applies to local carriers, unions, labor leaders, ships and operators of ships.

Let us then turn to the proof in order to determine whether a prima facie case has been established as to any defendant.[44] Each defendant was proved by its own admission to have cloaked itself for hire with the perquisites and advantages of a common carrier in a business touched with the public interest. The Terminal Company had assumed the specific obligation to Wards of handling the switching operations required to carry out the basic commitments of the line rail carriers.

 As to certain shipments, each rail carrier bound itself by its voluntary undertaking to pick up or deliver such shipments by use of its own transport or local drayage,[45] and, in lieu there-

---

44. "To make out a prima facie case * * * under a plea of the general issue, the plaintiff had the burden to prove the material facts alleged, that is, the receipt of the goods by the carrier for transportation to the point of destination, for a reward, and that the goods were injured in transit with resultant damages. * * * Upon such proof a prima facie case, including negligence is established against the carrier." Anderson v. Railway Express Agency, 1948, 34 Ala.App. 191, 39 So.2d 689, 691. " * * * the shipper, to make a prima facie case * * * is required to show only the fact of shipment made and a failure to deliver at destination." The burden is on the carrier to show that a permissible defense was the cause of the failure. American Fruit Distributors of California v. Hines, 1921, 55 Cal.App. 377, 388, 203 P. 821, 826.

45. The railroads are free to give or withhold pick-up and delivery service within

terminal areas (Pick-up and Delivery— Official Territory, 218 I.C.C. 441, 483), or on "spur-tracks owned by an industry." When the line-haul rate covers delivery, see United States v. American Sheet & Tin Plate Co., 1937, 301 U.S. 402, 409, 57 S.Ct. 804, 808, 81 L.Ed. 1186, according to the filed tariff or pick-up and delivery is so included, these become an integral part of the practice of the carrier which it is bound to perform since the railroad offers all such transporation "as component parts, not as separate or distinct segments, of its single service." Thomson v. United States, 1944, 321 U.S. 19, 24, 64 S.Ct. 392, 395, 88 L.Ed. 513. The principle is "equally controlling where the contract for the entire transportation is made by common carriers by motor vehicle." Sun Insurance Office Limited of London v. Be-Mac Transport Co., Inc., 8 Cir., 1942, 132 F. 2d 535, 537. In accordance with the theory of reasonable, nondiscriminatory custom, before the passage of the Inter-

of, paid Wards a sum stipulated in the tariff for performing such services. The line rail carriers each adopted these incidents as part of the common law obligation of carriage [46] by withdrawing reasonable regulations which they had previously set up requiring delivery to consignee at the freight depots and train tracks of the carriers. The abandonment was made deliberately by their tariffs for profit and in the attempt to meet competition by the motor carriers.

The line motor carriers, since they operated on highways constructed and maintained by the people, made transportation across the Portland area and pick-up and delivery a major consideration of their respective holding out for hire. This obligation was accepted by them in order to take business from the railroads. While they also had an alternate arrangement for the shipper or consignee to receive and deliver at their respective depots, this was only an additional advantage to the shipper. Robertson had all the duties of a line-haul motor carrier, in addition to specific commitments to the other motor carriers and the line railroads. The Railway Express Company had assumed the obligations similar to the other carriers.

■■■ The question of reasonable request for service is next for consideration. As to inbound shipments, the carrier, upon acceptance, voluntarily assumed obligations for hire which required transportation across the Portland area and delivery to Wards, as consignee, at its Portland establishment, at all events and at the peril of the carrier, as above noted. It is an admitted fact that with but five exceptions each carrier, rail or motor, had in its possession during the period at least one shipment from a point outside the Portland area regularly consigned and accepted for delivery to the Portland establishment. As to outbound shipments, there must have been a reasonable request for receipt at the plant and transportation to the line equipment of the carrier. Such request was conclusively established by the knowledge of the individual carriers as to the demands of Wards, its known necessities and the carrier's own previous practice of receiving goods from the establishment. In any event, repudiation by the carriers absolved Wards from making the request.[47]

Neither the line-haul rail carriers nor the line-haul motor carriers limited the three essentials of the "holding out."

state Commerce Act, the railroads had generally confined acceptance and delivery to stations, warehouses or the purlieu thereof. But where the custom and "usage was to run their cars upon a side track to private warehouses" to receive grain, the carrier "could not capriciously require that the grain should be delivered in a different manner, or at a different place." Galena & Chicago Union Railroad Co. v. Rae, 1857, 18 Ill. 488, 491.

46. The common law required the carrier to deliver to the consignee. All of the incidents of the obligation of the common carrier remained fixed until delivery was so accomplished. This was adopted into American general law. But, by analogy with the shipping trade, where the ship only transported from port to port, see Dane, I Digest of American Law 477–481 (1823), the railroads for a long period of time limited the engagement by tariffs from station to station. The result was that, at the end of the trans-

portation to the station, the duty was ended except to give reasonable notice. But when, in order to meet truck competition, the rail carriers again adopted the detail of delivery to the consignee, the original form of the obligation came again into effect. In the instant case, the pick-up and delivery service described in the tariff was not "an unlawful preference because a departure from filed tariffs," United States v. Wabash Railroad Co., 1944, 321 U.S. 403, 405, 64 S.Ct. 752, 753, 88 L.Ed. 827, but a distinct duty arising from the tariffs themselves.

47. A defect in the demand is not available when the bailee totally repudiates the defendant's right or bases his refusal to surrender on other grounds. Sharp v. Pratt, 3 C. & P. 34, 172 Eng.Rep. 311 (1827). Bell v. Norfolk Southern Railroad Co., 1913, 163 N.C. 180, 185, 79 S.E. 421, held that, where the demand was refused as to two cars, no further demand was necessary.

Each held itself out as prepared (1) to transport in commerce goods described in its tariff of any shipper through an area of Portland there described, from or to the place of business in said area from or to its facilities for line-haul transportation, whenever request or customary practice required acceptance at said plant or delivery to consignee at the plant, (2) to accept, receive and transport, as above described, such goods from such plant, where request or customary practice required, and (3) to deliver to consignee, at said plant in said area, goods which had been received for delivery under the tariff setting up such service.

■ The Court expressly finds that each of the carrier defendants failed and refused, as to some shipments, to perform at least one of the obligations of the "holding out" above set forth. With few exceptions, each carrier had received some shipments of goods described in the tariff, for transportation in intrastate or interstate commerce from points ouside the Portland area, for delivery to Wards at its plant in the area, which it failed and refused to transport in commerce in said area and which it failed and refused to deliver to Wards at the plant in said area. Each carrier refused to transport goods for Wards in the Portland area. Each denied Wards access to the facilities of intrastate and interstate commerce for goods so described. Robertson, Terminal Company and Railway Express each failed and refused to perform some of these duties. The refusals, failures, denials and repudiation were made by each line carrier through its agent, Robertson or Terminal Company,[48] through its own employees on the ground in line of duty, and through the acquiescence of its executives.

Each of the defendants, through the action of its respective authorized agents, employees in the course of employment, took joint action with another carrier in the violation of obligations owed from the latter to Wards, as above outlined. Each was then liable if damage ensued, unless some justification were established in defense.

■ The Sherman Anti-Trust Act recognizes an action for conspiracy, but, of course, this is confined strictly by the terms of the statute. It need not be determined whether there was a civil action of conspiracy at common law. No inquiry will be made as to the existence under the law of the State of Oregon of a separate cause of action for a tort of conspiracy. Wards' cause of action was based on neither theory. Persuading, counseling or assisting another in breaching a peculiar duty of the latter alone laid the basis for an action at common law. So likewise, joint action in breaching such an obligation incumbent upon only one party gave rise to joint and several liability of all who participated.[49] This Wards has relied upon and supported with proof as to each defendant.

■ There are defenses upon the ground that, since these matters have been involved in other proceedings, relitigation is prohibited here upon the principle of res adjudicata. There were suits against shipowners in which damages for the same items here involved were pleaded. Some of these were dismissed by stipulation and some by judgment. But that only means that the

---

48. The railroads are, it is true, not liable for the acts or defaults of another carrier except as is defined in legislation such as the Carmack Amendment, 49 U.S.C.A. § 20. But they were each liable for their own acts and defaults. Where they had chosen other carriers such as Robertson or Terminal Company to perform obligations which each had voluntarily accepted by tariff provision, each was liable for the acts of such other carriers. Bank of Kentucky v. Adams Express Co., supra note 16, 93 U.S. at page 182; Harris Transfer & Warehouse Co. v. Louisville & N. R. Co., D.C., 1947, 72 F.Supp. 389, 392. See also Sun Insurance Office Limited of London v. Be-Mac Transport Co., Inc., 8 Cir., 1942, 132 F.2d 535.

49. Prosser on Torts 1092–1107 (1941). IV Restatement of the Law of Torts §§ 875, 876, 882 (A.L.I., 1939).

particular shipowner was not liable.[50] It does not prevent Wards from proving each or all defendants liable. The claim is also made that, although, upon petition of Wards to require twelve of the motor carriers, here defendants, to cease and desist from discrimination against Wards, the Interstate Commerce Commission made no order requiring action,[51] but dismissed the complaints, the Court cannot give relief here. There are several answers. First, findings of an administrative body are not binding upon itself or this Court.[52] Second, the strike had ceased and the carriers were fully serving the plant when the examiner's finding in Wards' favor was made and when the Commission reversed. Therefore, there was no jurisdiction since the proceeding was moot.[53] Third, the only questions before the Commission involved labor relations, which were not within its competency.[54] Finally, the Commission did not have the railroads before it and did not have authority to nor did it consider whether there was a combination of carriers and unions to isolate Wards from interstate commerce by denying it local transportation.[55]

■■■■■■ The Court has considered all these questions, because they are properly raised and are relevant to this dispute. This Court has general jurisdiction.[56] The administrative tribunal has

50. IV Restatement of the Law of Torts § 896 (A.L.I., 1939).

51. Notwithstanding the recent expressions of the Supreme Court as to "negative orders," United States v. Interstate Commerce Commission, 1949, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451, no review could have been allowed here, since such proceedings would not fall within the terms of the statute as a case "brought to enjoin, set aside, annul, or suspend in whole or in part any order of the Interstate Commerce Commission." 28 U. S.C.A. § 41(28), now 28 U.S.C.A. § 1336. No reparations were given or denied, or could have been. No action was required or right thereto denied when the action was being withheld. There were no findings affecting anyone. The alleged reasons and conversation in the memorandum are immaterial. To give this dismissal of the petition any force except bringing the particular proceeding to a close would be to confer the general jurisdiction of a court upon the Commission, which has certainly never been contemplated.

52. Segal v. Travelers Insurance Co., D.C., 1950, 94 F.Supp. 123. Under such circumstances, Wards was not bound to appeal from the administrative dismissal of a petition for mandatory action before resorting to a judicial tribunal for damages.

53. Courts of general jurisdiction are careful to point out that they have no jurisdiction to decide controversies which have become moot.

54. In the Memorandum filed, the Commission states: "In our opinion, that is a matter involving the labor relations between the carriers and their employees, over which we have no jurisdiction * * *." So far as it went, this expression was correct. It was absolutely inconsistent for the Commission to decide that the carriers were justified in recognizing the refusal of their own employees to perform the duties for which they were employed as sufficient grounds for failure to carry out common law duties, since this also involved labor relations over which they were given no jurisdiction.

55. The Commission "cannot decide definitely whether the transaction contemplated constitutes a restraint of trade or an attempt to monopolize * * *." McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 79, 64 S.Ct. 370, 377, 88 L. Ed. 544. Georgia "merely asks that the alleged rate-fixing combination and conspiracy among the defendant-carriers be enjoined. * * * that is a matter over which the Commission has no jurisdiction." Georgia v. Pennsylvania Railroad Co., 1945, 324 U.S. 439, 455, 65 S.Ct. 716, 725, 89 L.Ed. 1051. And see Eastern Railway Co. of New Mexico v. Littlefield, 1915, 237 U.S. 140, 35 S.Ct. 489, 59 L.Ed. 878. "Not only does the declaration in this case charge a discrimination * * * but it also charges a conspiracy to monopolize the business * * * this contention [that this is a matter "subject to the * * * jurisdiction exclusively of the Interstate Commerce Commission"] is not well founded." Gulf & S. I. R. Co. v. Buddendorff, 1916, 110 Miss. 752, 70 So. 704, 708, L.R.A. 1916D, 253.

56. The difficulty with the situation is that there was a conflict of jurisdiction between administrative boards. Some of the key problems here might logically

only that special jurisdiction [57] which is given to it by Act of Congress. There are no presumptions which attend its findings.[58] It is not technically a court. The jurisdiction of the Commission to act or refuse to act was not established. Indeed, there was a complete absence of authority.[59]

The thesis of the Commission and the key of the defense here is that defendants were excused from serving Wards' plant because there was a strike there, which none of the defendants caused. The facts are conceded, but these constitute neither defense nor excuse.

■ The circumstances constituting the standard justifications which the common law recognized for failure to perform the obligations of a common carrier are not present here. The defendants were not prevented from transporting Wards' goods by act of God. No outright public enemies stopped them. The defendants do not contend that the acts of labor leaders or labor organizations are the acts of public enemies,[60] nor would the Court countenance such a claim.

■ Here then we come to a full stop. The proof shows each defendant liable prima facie, and no defendant has established [61] the only defenses permissible in an action of this type. The opinion might well end here.

The defendants have, however, pressed upon us with earnestness and vigor certain excuses or alleged justification. While these are entirely irrelevant and immaterial under the law heretofore declared, consideration will now be given thereto.

have come before the National Labor Relations Board, the Railway Labor Board, or the Interstate Commerce Commission. But the courts were empowered to act and specifically now have jurisdiction of this controversy.

57. An analogous case in the state court may illustrate the point. "The commissioner's jurisdiction is limited. His authority must affirmatively appear from the law creating his office and defining his powers. Northern Pacific Railway v. Public Service Commission, D.C., 47 F. 2d 778." Oregon-Washington R. & Nav. Co. v. McColloch, 1936, 153 Or. 32, 55 P. 2d 1133, 1141.

58. So far from becoming res adjudicata as to facts, the administrative board could find one set of facts and a court or jury a different set in an identical setting and thus arrive at conclusions entirely different and at judgments diametrically opposed, each of which could be enforced. United Brick & Clay Workers of America v. Deena Artware, Inc., 6 Cir., 1952, 198 F.2d 637, certiorari denied 1952, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694; National Labor Relations Board v. Deena Artware, Inc., 6 Cir., 1952, 198 F.2d 645. It is only when a statute requires that a court must accept findings of fact of an administrative body.

59. This field requires careful analysis in working out distinctions. No one doubts that at times there is "not only a commitment of primary, but likewise of exclusive, jurisdiction to the administrative, and exhaustion of the remedies is mandatory. Texas & Pacific Railway Co. v. American Tie & Timber Co., 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255. * * *" Trans-Pacific Airlines, Limited v. Hawaiian Airlines, Limited, 9 Cir., 1949, 174 F. 2d 63, 66. Although resort to primary jurisdiction of the Interstate Commerce Commission would apparently become mandatory in some labor cases because of statutory direction, Ispass v. Pyramid Motor Freight Corp., D.C., 1943, 54 F. Supp. 565; Id., D.C., 1945, 59 F.Supp. 341, the Supreme Court appears to have preferred disposition by the dialectic of the common law courts subject to the statutes. Levinson v. Spector Motor Service, 1947, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158; Pyramid Motor Freight Corp. v. Ispass, 1947, 330 U.S. 695, 67 S.Ct. 954, 91 L.Ed. 1184.

60. "* * * a strike was not an act of God or an act of a public enemy, * * *." Ritchie v. Oregon Short Line R. Co., 1926, 42 Idaho 193, 244 P. 580, 583, 45 A.L.R. 909, and cases cited therein.

61. The burden is upon the carrier to prove that its failure to perform was caused by the act of God, the public enemy, or some cause against which it might lawfully contract. Galveston, Harrisburg & San Antonio Railway Co. v. Wallace, 1912, 223 U.S. 481, 492, 32 S.Ct. 205, 56 L.Ed. 516; Schnell v. The Vallescura, 1934, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373.

These excuses for failure to perform the rigid requirements placed upon carriers all have root in the field of labor relations. But neither labor unions nor labor leaders were brought into this suit as parties by either plaintiff or defendants. The railroads and motor operators have thus had the burden perforce of defending the whole union line. The carriers, however, are not setting up the assumed rights of labor for protection of their employees, but in their selfish interest to escape liability for their own conduct. The discussion which follows must be oriented in relation to the fact that, though based upon the record, the labor leaders and unions are not present in court to protect themselves.

■ In considering the concerted activities of labor, it will be found that not all such action is legal. The objects of such concerted activities may be improper even when labor organizations and their members alone are involved. Secondly, the means employed may be proscribed by law. Thirdly, there is no immunity for the sympathetic strike by organizations and individuals with no unity of interest in the original controversy. Again, although unions and their members might with impunity take certain action, if they succeeded in getting employers engaged in business to use their economic power by combination with the unions and the leaders to accomplish unlawful objectives by unlawful means, no one would be immune. Finally, common carriers, who have duties to the public which are binding upon them by law and are also binding upon employees of such carriers, cannot be coerced into nor can they voluntarily join in concert of action which results in a violation of these obligations without being liable to respond criminally and civilly therefor.

■ While "workers are privileged intentionally to cause harm to another by concerted action if the object and the means of their concerted action are proper; they are subject to liability to the other for harm so caused if either the object or the means of their concerted action is improper." [62]

■ Judged by this standard, the workers who took concerted action here would, upon this record, be liable themselves, because, not only were the objects illegal,[63] but the means employed

62. IV Restatement of the Law of Torts § 775 (A.L.I., 1939).

63. "The fact that the injury was inflicted by a strike is sometimes a justification. But a strike may be illegal because of its purpose, however orderly the manner in which it is conducted." Dorchy v. Kansas, 1926, 272 U.S. 306, 311, 47 S.Ct. 86, 87, 71 L.Ed. 248; Peters v. Central Labor Council, 1946, 179 Or. 1, 169 P. 2d 870. The attitude of the Supreme Court is expressed in International Union, U. A. W., A. F. of L., Local 232 v. Wisconsin Employment Relations Board, 1949, 336 U.S. 245, 259, 69 S.Ct. 516, 524, 93 L.Ed. 561, where, reviewing the law before the passage of the Labor Management Relations Act of 1947, 29 U.S. C.A. § 141 et seq., they say that the recognition of the right to strike "did not operate to legalize the sit-down strike, which state law made illegal and state authorities punished. National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L. Ed. 627. Nor, for example, did it make

legal a strike that ran afoul of federal law, Southern S. S. Co. v. National Labor Relations Board, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246; nor one in violation of a contract made pursuant thereto, National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; nor one creating a national emergency, United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884." The objects of the union leaders were (1) to compel the union drivers to strike if the motor carriers did not cease handling Wards' goods; (2) to force or persuade rail carrier employees as well as motor carrier drivers concertedly to refuse to perform their duties owing to the public, in violation of specific statutes; (3) to force or persuade all carriers to violate their contracts with shippers and contracts with their own labor; and finally (4) to bring on a complete stoppage of traffic in the Portland area if that were necessary to stop the transportation of Wards' goods, thus bringing on a national crisis on the eve of war. See IV Restatement of the

were also improper.[64] The ultimate object was to cut Wards off [65] from access to the facilities of commerce by causing common carriers to violate duties imposed by law, to deprive it of all transportation in the area and to accomplish the ruin of its business [66] by organizing the business community against it. These objectives were to be accomplished by illegal means. Violence and threats of violence enforced by memories of violence [67] used by the same organizations were to be employed to regiment the business community in these objects. Pickets in front of transport depots, walk-outs of transportation employees, secondary boycotts of common carriers to compel them to make common cause were illegal.[68] In many other particulars, the concert of action was illegal, as will

Law of Torts § 794 (A.L.I., 1939). It is also illegal for a labor organization to exert pressure for the purpose of forcing an employer to violate state law. Building Service Employees International Union, Local 262 v. Gazzam, 1950, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045; Hughes v. Superior Court of California for Contra Costa County, 1950, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985; Giboney v. Empire Storage & Ice Co., 1949, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834.

64. Violence, threats of violence, threats of personal injury and property damage, obstructing entrances to a plant and the public streets, boycotts and blacklists, sit-down strikes and similar quasi-strikes and combinations with employers have all been condemned by the courts as illegal, even when the purpose of such activity is a lawful labor objective. National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627; Southern S. S. Co. v. National Labor Relations Board, 1942, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246; Allen-Bradley Local No. 1111, United Electrical, Radio & Machine Workers of America v. Wisconsin Employment Relations Board, 1942, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154; Carpenters & Joiners Union of America, Local No. 213 v. Ritter's Cafe, 1942, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143; Hotel & Restaurant Employees' International Alliance, Local No. 122 v. Wisconsin Employment Relations Board, 1942, 315 U.S. 437, 62 S.Ct. 706, 86 L.Ed. 946; Allen-Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 1945, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939; Printing Specialities and Paper Converters Union, Local 388, A. F. of L. v. Le Baron, 9 Cir., 1948, 171 F.2d 331; Wallace v. International Association of Mechanics, 1936, 155 Or. 652, 63 P.2d 1090; Starr v. Laundry & Dry Cleaning Workers' Local Union No. 101, 1936, 155 Or. 634, 63 P.2d 1104; "It needed no [new statute] * * * to punish and prevent violence, breaches of the peace, assault and battery, arson, ma-

licious destruction of property, trespass, and the closing of public streets by private individuals." American Federation of Labor v. Bain, 1940, 165 Or. 183, 209, 106 P.2d 544, 555, 130 A.L.R. 1278.

65. "The minutes of the general membership meeting of Teamsters' Local 162 held December 17, 1940, read as follows: ' * * * Moved and seconded that we individually go on record and adopt the hands off policy in regard to Montgomery Ward. Carried * * *.' The phrase, 'hands off policy' used in the minutes, meant a policy of not handling Ward goods." Pre-Trial Order, p. 333. "* * * Joint Council 37 [of the Teamsters Union] ordered all local unions and their members to desist and refrain from handling any shipments in which Wards had any known interest." Pre-Trial Order, p. 211.

66. "The conspiracy was one to ruin appellant's business. Therefore the means adopted were unlawful." Scavenger Service Corporation v. Courtney, 7 Cir., 1936, 85 F.2d 825, 833. See also Albrecht v. Kinsella, 7 Cir., 1941, 119 F.2d 1003; Manaka v. Monterey Sardine Industries, Inc., D.C., 1941, 41 F.Supp. 531; Carlson v. Carpenters Contractors' Ass'n of Chicago, 1932, 305 Ill. 331, 137 N.E. 222, 27 A.L.R. 625.

67. " * * * the momentum of fear generated by past violence would survive * * *." Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, Inc., 1941, 312 U.S. 287, 294, 61 S.Ct. 552, 555, 85 L.Ed. 836.

68. Hicks v. Bekins Moving & Storage Co., 9 Cir., 1937, 87 F.2d 583; Illinois Central R. Co. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Union Local 568, D.C., 1950, 90 F.Supp. 640; Consolidated Freight Lines, Inc. v. Department of Public Service, 1939, 200 Wash. 659, 94 P.2d 484; Burlington Transp. Co. v. Hathaway, 1943, 234 Iowa 135, 12 N.W.2d 167, 149 A.L.R. 1238; Terminal R. Ass'n of St. Louis v. International Ass'n of Ma-

be pointed out hereafter. When such objectives, through such means, were to be accomplished by a combination of the primary strikers with workers who were employed in the transportation industry and who had no unity of interest with the primary employer or employees, the illegality of the procedings is clear in the first instance.[69]

▮▮▮ It is thus seen that the combination of the unions and transport employees with the purpose of coercing the carriers was illegal in objectives and means. But the carriers joined in the concert of action also to protect their own economic interest. This circumstance alone deprived the combination of legality even if it should be assumed that the object and the means were proper for a concert of workers. The cooperation of the carriers in itself rendered the scheme unlawful as to all parties.[70] The rail carriers took joint action among themselves. The motor carriers acted together. Each took action in concert to cut Wards off from interstate transportation, which it was its duty to furnish. This was a conspiracy in restraint of trade, denounced by the statutes. To this charge, it is possible the workers may have had some lawful answer, but carriers had none. As to defendants, the objects were illegal, and so were the means.[71]

chinists, 1948, 333 Ill.App. 288, 77 N.E.2d 448.

69. "Mere remote economic interest arising from the desirability of plaintiff's continued shipping over defendant railroad's lines cannot furnish the required interest." Pacific Gamble Robinson Co. v. Minneapolis & St. Louis Ry. Co., D.C., 1949, 85 F.Supp. 65, 67. See also Columbia River Packers Association, Inc. v. Hinton, 1942, 315 U.S. 143, 147, 62 S.Ct. 520, 86 L.Ed. 750; Gomez v. United Office and Professional Workers of America, CIO Local 16, D.C., 1947, 73 F.Supp. 679; Atchison, Topeka and Santa Fe Railway Company v. Sillampa, 18 CCH Lab.Cas. No. 65,843 (D.C.N.M.1949); Atchison, Topeka and Santa Fe Railway Company v. Shopmen's Local Union No. 546 of International Association of Bridge, Structural and Ornamental Iron Workers, 18 C.C.H.Lab.Cas. # 65,857, D.C.W.D.Okl.1950; Feldman v. Weiner, 1940, 173 Misc. 461, 17 N.Y.S.2d 730. See Note 87 infra, for cases dealing with suits for injunctions brought by common carriers against employees involved in labor disputes with employers other than the plaintiff-carrier.

70. " * * * it is clear that if the plaintiffs were to do that which the union sought to compel them to do, namely, not handle the Blaul merchandise, they would be doing an act prohibited by the common law and the statutory law of this state and an act that could subject them to criminal prosecution." Burlington Transp. Co. v. Hathaway, 1943, 234 Iowa 135, 12 N.W.2d 167, 169, 149 A.L.R. 1238. The carrier's duty "is positive and should be kept clear from agreements with others than the shippers which in effect stipulate for its violation." Menasha Paper Co. v. Chicago & Northwestern Railway Co., 1916, 241 U.S. 55, 59, 36 S.Ct. 501, 503, 60 L.Ed. 885. "Railroad companies cannot enter into contracts with each other that will disable either of them from performing service to the public * * *." Chesapeake & Ohio Railway Co. v. Peed, 1913, 155 Ky. 696, 701, 160 S.W. 472, 474.

71. The intentional infliction of injury upon a person by a combination of unions and businessmen is illegal, even when such conduct by unions alone is privileged. Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 1945, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939; United States v. Brims, 1926, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403. Unions and labor leaders who initiated the scheme for proper labor objectives such as wages compelled businessmen, by pressure of strikes and walk-outs, to act in concert with them for illegal purposes in connection with interstate commerce, are themselves liable. Instructions on re-trial, Lumber Products Co. v. United States, N.D.Cal., January, 1946. But the businessmen who cooperated were also liable. United Brotherhood of Carpenters and Joiners of America v. United States, 1947, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973; Hawaiian Tuna Packers, Limited v. International Longshoremen's and Warehousemen's Union, C.I.O., D.C., 1947, 72 F.Supp. 562; United States v. Minneapolis Electrical Contractors Association, D.C., 1951, 99 F.Supp. 75; see cases cited in note 66, supra.

More important for this case, this action in concert deprived the carriers of all defenses. For defendants could not urge that action in which each had a part was an excuse for failure to transport.

A concert of action between carriers, such as there was here, to discriminate against a single shipper, is action in restraint of trade. The circumstance that labor leaders or unions may have initiated or encouraged the combination makes no difference. For Wards' difficulties were local and confined to its own area, while the obligations of the carriers were to the public, which suffered if every shipper and consignee were not served on equal terms. There would have been no drastic interference with commerce if there had not been an unlawful conspiracy against Wards of which each defendant became a member.

It does not require a written document or an express contract to indicate the adherence of a party to a combination of two or more to accomplish an unlawful purpose. Nor need one be the author of the design or one of the original parties to the formulation thereof.[72] In this case, the plan apparently originated in the minds of the labor leaders. It is sufficient if a person, after a conspiracy has been formulated by others and he has full knowledge of the purpose, willfully takes action in furtherance of the design. The concert of action effectuating the purpose is sufficient to establish adherence to the conspiracy.[73] Each of the defendants, through its employees on the ground in the course of employment and by the acquiescence[74] of its executives, was committed to the concert of action by acts calculated to accomplish the unlawful purposes of which each well knew.

The union of motor transport drivers, which had closed shop contracts with all motor carriers, and its members could not lawfully require a boycott of carriage of goods by such carriers, even though they were affiliated with unions of Wards' merchandizing and warehousing employees through the higher echelons. The unions of rail employees and their members were clearly outside the pale since they had connection neither with the merchandizing or mail order business nor with any union to which Wards' employees belonged. The state law of Oregon, which was applicable as to picketing, secondary boycotting, local violence and combinations for illegal objects, was controlling.[75]

---

72. "* * * a conspiracy is shown, even though individual conspirators may have done acts in furtherance of the common unlawful design apart from and unknown to the others." Allen v. United States, 7 Cir., 1924, 4 F.2d 688, 691. "Acceptance * * * without previous agreement, of an invitation to participate in a plan * * * is sufficient * * *." Interstate Circuit, Inc. v. United States, 1939, 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610.

73. "* * * uniformity in policy forms the basis of an inference of joint action." Milgram v. Loew's Inc., 3 Cir., 1951, 192 F.2d 579, 583, certiorari denied, 1952, 343 U.S. 929, 72 S.Ct. 762, 96 L.Ed. 1339. "It taxes credulity to believe that the several distributors would, in the circumstances, have accepted and put into operation with substantial unanimity such far-reaching changes in their business methods without some understanding that all were to join, and we re-

ject as beyond the range of probability that it was the result of mere chance." Interstate Circuit, Inc. v. United States, 1939, 306 U.S. 208, 223, 59 S.Ct. 467, 473, 83 L.Ed. 610.

74. "It appears from the affidavits that the carriers acquiesced in the unions' demands and that the heads of the companies refused to transport. They also show a conspiracy between the carriers and the unions to commit a violation of the federal statutes by discriminating against plaintiff's freight." Burgess Bros. Co., Inc. v. Stewart, 1920, 112 Misc. 347, 184 N.Y.S. 199, 209. "* * * Old Dominion Transportation Company admits that it will not transport his shipments until its employees consent to handle them. For this reason it may be regarded as a party to the combination." Buyer v. Guillan, 2 Cir., 1921, 271 F. 65, 68, 16 A.L.R. 216.

75. It will be remembered that the incidents dealt with in this opinion occurred from

The defendants seek to destroy the effect of their concert of action by a highly emotional appeal. They say that Wards was guilty of unfair labor practices toward its own employees and thus was itself the cause of its own damage.

In some opinions, the act of the shipper is given recognition as a justification for the failure of the carrier to perform a traditional duty. And the rail carriers try to give more weight to this doctrine by a clause of the bill of lading which purports to excuse the particular carrier where the failure is caused by the "act or default of the owner." The argument is that Wards caused or continued the strike and that the picket line resulted. Of course, most of the defaults complained of did not relate to shipments upon which there was a bill of lading. The failure either to accept or transport in the local area on any terms was the cause of the bulk of the damages.

 This Court does not minimize, palliate or defend the policy of Wards toward its employees. In fact, it leaves consideration of that problem to the administrative agency actually vested with jurisdiction. In any event, even if Wards had flagrantly flaunted its own employees and dealt with them oppressively, the carriers did not become executioners for the state. The original dispute was a local one and was peaceably settled by legal means after the strike failed and the carriers had futilely violated their duties. Wards was not an outlaw.[76] If there was a peaceful picket line at its plant because of its wrongful act, that circumstance did not authorize the carriers to enter into a combination with outside unions and others to refuse to carry its goods. Nor were the carriers excused by other limiting clauses of the bills of lading.[77]

December 7, 1940, to July 26, 1941. The Labor Management Act was passed in 1947. The law of the State of Oregon was admittedly applicable over all but a minor portion of the labor field in 1940. The current question of how much change the Act made is one on which we express no opinion. But of the time of which we now speak it might well be said: "The common law, the first effective resistance movement to conduct in restraint of trade, is showing us today how certain kinds of union action restrain trade, to our general detriment, and how such conduct may be prohibited without qualifying the fundamental approval of the right of self-organization." Proceedings of New York University Fifth Annual Conference on Labor, Petro, Participation by the States in the Enforcement and Development of National Labor Policy, p. 74 (1952).

The law of the State of Oregon forbids concerted activity for an unlawful purpose, as well as illegal activity for proper labor objectives. Peters v. Central Labor Council, 1946, 179 Or. 1, 169 P.2d 870; Wallace v. International Association of Mechanics, 1936, 155 Or. 652, 63 P.2d 1090. A labor union may not exert pressure to compel an employer to violate the law. Markham & Callow, Inc. v. International Woodworkers of America, Lumber & Sawmill Workers Union, 1943, 170 Or. 517, 135 P.2d 727; State ex rel. Tidewater Shaver Barge

Lines v. Dobson, 1952, 195 Or. 533, 245 P.2d 903. A union may not legally demand that an employer "join it in its monopolistic aim." Schwab v. Moving Picture Machine Operators Local No. 159, 1941, 165 Or. 602, 109 P.2d 600, 608. The Oregon court has held that secondary activity may be enjoined. State ex rel. Tidewater Shaver Barge Lines v. Dobson, supra. The blocking of ingress to and egress from the employer's premises, "violence, intimidation, and coercion" have been condemned. Starr v. Laundry & Dry Cleaning Workers' Local Union No. 101, 1937, 155 Or. 634, 63 P.2d 1104, 1109; Wallace v. International Association of Mechanics, supra; American Federation of Labor v. Bain, 1940, 165 Or. 183 106 P.2d 544, 130 A.L.R. 1278.

76. " * * * reprehensible as was that conduct of the respondent, there is no ground for saying that it made respondent an outlaw or deprived it of its legal rights to the possession and protection of its property." National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 253, 59 S.Ct. 490, 495, 83 L.Ed. 627.

77. See Consolidated Freight Lines, Inc. v. Department of Public Service, 1939, 200 Wash. 659, 94 P.2d 484, in which the court held that a clause relieving the carrier of its duty when it became "impractical" to operate did not excuse the

Since the damages of which Wards complains resulted from failure of the carriers to perform their statutory duties in combination, the "act or default of the owner" could not be the cause. The "strike" was a mere condition which the labor leaders accepted as an excuse for an extended illegal combination. The "obstructions" were aids to the unlawful design, and the highways were blocked pursuant to the concert. The carriers cannot take advantage of illegal action, in which they acquiesced, as an excuse.

Besides, in order to establish such defenses affirmatively, the carriers must show that no action of theirs contributed to the result. It must be conceded under all the authorities that, simply because the prospective shipper's plant is strikebound,[78] this is not sufficient to excuse a carrier from the three duties. Even where prevented by the act of God or the public enemy, there must be affirmative showing that it did everything in its power to carry out its absolute obligation.[79]

As a result of this necessity, the defendants claim that they were prevented from entering the plant by violence.[80] But this circumstance, even if true, would not keep the carriers from performing the balance of their duties.

carrier's failure to cross a picket line. Boston & Main Railroad v. Piper, 1918, 246 U.S. 439, 445, 38 S.Ct. 354, 355, 62 L.Ed. 820. "While this provision was in the bill of lading, the form of which was filed with the Railroad Company's tariffs with the Interstate Commerce Commission, it gains nothing from that fact. The legal conditions and limitations in the carrier's bill of lading duly filed with the Commission are binding until changed by that body * * * but not so of conditions and limitations which are, as is this one, illegal, and consequently void."

78. "* * * the fact that plaintiff is strike-bound does not relieve defendant of its common carrier duties to plaintiff * * *." Pacific Gamble Robinson Co. v. Minneapolis & St. L. Ry. Co., D.C., 1949, 83 F.Supp. 860, 862, appeal dismissed 8 Cir., 1950, 181 F.2d 812. "They being common carriers, it was their duty * * * to send their trucks through the picket line." Consolidated Freight Lines, Inc. v. Department of Public Service, 1939, 200 Wash. 659, 94 P.2d 484, 485.

79. When the bill of lading exempts the carrier from liability for damage caused by a "strike," the carrier must nevertheless show that "notwithstanding the strike on the part of its employees, it had used every reasonable effort to preserve the shipper's property, to prevent its being damaged, and to cause it to be transported to its destination." American Fruit Distributors of California v. Hines, 1921, 55 Cal.App. 377, 387, 203 P. 821, 825. See also United States Express Co. v. Kountze Brothers, 1869, 8 Wall. 342, 352, 75 U.S. 342, 352, 19 L.Ed. 457; Pennsylvania Railroad Co. v. Olivit Brothers, 1917, 243 U.S. 574, 37 S.Ct.

468, 61 L.Ed. 908; Carroll v. Royal Mail Steam Packet Co., 1929, 130 Or. 294, 279 P. 861.

80. Violence is local in character and can be controlled by local authorities. See Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 512, 60 S.Ct. 982, 84 L.Ed. 1311. There were various criminal statutes of the State of Oregon then in effect which might have been applied. O.C.L.A. § 23–1219, throwing or projecting missiles at any "motor or railway vehicle". O.C.L.A. § 23–1210, placing obstructions on roadbed or tampering with track or appliance. But, if the emphasis is placed on federal law, there is a pertinent expression of the United States Supreme Court. Denying an injunction because the carrier failed to comply with the Norris-La Guardia Act, 29 U.S.C.A. § 101 et seq., the court stated: "Suits for recovery of damages still may be brought in the federal courts * * *. Federal statutes supply criminal sanctions, enforceable in the federal courts, against persons who interfere in specified ways with the operation of interstate trains or destroy the property of interstate railroads." Brotherhood of Railroad Trainmen, Enterprise Lodge, No. 27 v. Toledo, Peoria & Western Railroad, 1944, 321 U.S. 50, 63, 64 S.Ct. 413, 420, 88 L.Ed. 534. Federal statutes which might here be applicable provided that it was unlawful for any agent "or person acting for or employed by such corporation" who does or omits "any act, matter, or thing in this chapter prohibited or declared to be unlawful, * * *." 49 U.S.C.A. § 10. See also 18 U.S.C.A. § 1992. These statutes seem to bring this matter squarely under the rule of the Southern Steamship case, supra.

The claim of the carriers is that, since Wards was responsible for the strike and therefore the "violence," it was under obligation to remove the picket line. But the immediate employer is under considerable handicap in obtaining relief against its own employees.

■■ Even a carrier which is engaged in a dispute with its own employees cannot have an injunction in a federal court without compliance with the Norris-La Guardia Act, 29 U.S.C.A. § 101 et seq.[81] An employer in the mail order business is subject to no public duties and is, of course, required to comply with the arduous conditions precedent of the statute before relief could have been granted.

Such was the rationale of the decision of this Court in M & M Wood Working Co. v. Plywood & Veneer Workers Local Union No. 102, D.C., 1938, 23 F.Supp. 11, where injunctive relief was denied the immediate employer, although violence and stoppage of interstate transportation were involved, because it had not been alleged and proved that the local police were unable to cope with the situation, as the Norris-La Guardia Act required.

■ But a common carrier bound to serve the public on nondiscriminatory terms is entitled to injunction to permit it to carry out its duties to a shipper against unlawful interference caused by concerted action of labor.

This Court issued injunctions, which were enforced by contempt proceedings, at the petition of the carrier, who was not involved in the immediate dispute against the union and its members, who attempted to prevent the performance of its duties to the public. Waterfront Employers of Portland v. Committee for Industrial Organization, 1 C.C.H.Lab.Cas.

No. 18,096, p. 382 (D.C.Oregon, 1938). Likewise, Local 162 and other units of the Teamsters Unions, as well as leaders and members thereof, were enjoined from boycott of transportation of certain brands of beer in interstate commerce by refusal of the union drivers to transport or handle the product. California State Brewers Institute v. Beck, No. E–9702, United States District Court for the District of Oregon, June 28, 1937. Injunction orders were issued in similar suits in the federal courts of districts in Washington[82] and California.

At about the same time, the Ninth Circuit Court of Appeals, in the case of Hicks v. Bekins Moving & Storage, 87 F.2d 583, reversed the District Court of the Western District of Washington for sustaining a motion to dismiss a complaint. A warehouseman and contract carrier, transportation local of the Teamsters and other unions and officials thereof were defendants. The complaint contained allegations:

> " * * * that appellees combined and conspired to prevent, and did prevent, the transportation of personal property from the Bekins Company's warehouses in Seattle, Wash., to points outside the State of Washington, in vans or motor trucks other than those manned and operated by members of the Union; that, in pursuance of said combination and conspiracy, appellees prevented the transportation of appellant's property from Seattle, Wash., to Wilkes-Barre, Pa.; and that, by reason thereof, appellant and his assignor were injured and damaged in the amounts stated." 87 F.2d at page 586.

81. In Lee Way Motor Freight, Inc. v. Keystone Freight Lines, Inc., 10 Cir., 1942, 126 F.2d 931, the court denied the carrier an injunction for failure to comply with the Norris-La Guardia Act, but recognized the key thesis of the present opinion, that "a common carrier of freight in interstate commerce [has] certain duties and responsbilities toward the

public, and ordinarily such duties and responsibilities are paramount to private rights." 126 F.2d at page 934.

82. California State Brewers' Institute v. International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers, 1 C.C.H.Lab.Cas. No. 18,030, p. 293 (W.D. Wash., 1937).

The Court said:

"These are specific allegations of fact which, if true, warrant a judgment for appellant. Buyer v. Guillan, 2 Cir., 271 F. 65, 16 A.L.R. 216; Steers v. United States, 6 Cir., 192 F. 1, 4."

Such was the law on the eve of the occurrences complained of in the instant case.

 This last case indicates the essential flaw in the theory of the carriers. There were acts of violence and threats of violence here. But these are not even plausible excuses for the carriers because of the concert of action between the employees of the motor carriers and the railroads, eventually approved by defendants, which actually produced such conditions.

Actually, in the instant situation, the employees of the motor carriers refused to go through the picket line and refused to carry any goods of Wards in the Portland area, not on account of violence or threats, but because of pressure from the labor leaders. The employees of Terminal Company encouraged the strikers to make a show of violence [84] and refused to cooperate when the local police attempted to remove the obstructions which were placed on the tracks by the strikers. The carriers became responsible for these actions, which fitted into the concerted plan. The union leaders approved. The executives of the motor carriers acquiesced in the action of their employees in the course of employment and of Robertson, as their representative.[85] The rail executives likewise acquiesced in the action of Terminal Company [86] and its employees. This all fell into the general plan and constitutes cooperation therewith.

 The problem faced by leaders of the conspiracy was to have enough violence so that the railroad crews would have plausible grounds not to serve

84. In fact, it appears that members of the switching crews were the first to suggest the use of violence to the pickets: "He said that they as the crew of this train were obligated to try to put the train into the plant. However, if we showed any form of violence that might inflict bodily harm on the crew that therefore their obligation was fulfilled by trying to put it in, and consequently they would not have to carry it on farther." Tr., p. 24, W–Morehouse. Speaking of a member of the switch crew, one picket testified: "They made a switch up there and he got off the train and came up to us and threw up his hands and said, 'Oh, you have got sticks and stones, and you are showing violence. We can't go through a picket line like that. We have got to get out of here,' or words to that effect." Tr., p. 18, W–Beatty.

85. The motor carrier defendants were generally following a policy of the League of which most were members, banded together to take joint action regarding labor and perhaps other problems. Their concerted action in refusal to perform their common law duties, failure to discharge employees who did not carry out orders in line of duty, acceptance of the secondary boycott of Wards' goods and the refusal of the unions to arbitrate the construction of the contracts in effect when the strike commenced and the affirmative signing and executing of the contracts of March 1, 1941, containing the illegal clause are evidence not only of concert of action, but of affirmative adoption and ratification of the acts of their own employees and of the union leaders.

86. Express authorization and ratification of refusal of Terminal Company and its employees to serve Wards may be found. In a formal statement, the rail carriers presented their position as follows: "The railroad crews are not unwilling to go through picket lines, but they refuse to do so when violence is threatened. They take the position that the necessity for police guards at the time of the switching is in itself a sufficient threat of violence which would justify a refusal to move the cars through the picket line. * * *" P.T.O., p. 299.

See also P.T.O., p. 301: "From time to time between December 27, 1940, and July 26, 1941, representatives of the respective defendant rail carriers, or some one or more of them, informed Wards' local officers that the rail carriers had considered the entire situation carefully and that the Terminal Company could do nothing more than it was then doing to switch cars to or from Wards' establishment."

Wards and still not enough to bring on judicial intervention on behalf of the employer, Wards. The dilemma posed in the situation was dramatically solved by the carriers and the strikers at the behest of the union leaders: the rail carriers announced that, if the police removed an obstruction from the track, before the rail crews would proceed, the officers must retire beyond effective reach. When black is white, this rule will have sense. If, in fact, violence had been beyond the power of the local police to control, it was incumbent upon the carriers to seek legal remedies.[87] As noted above, the carriers had specific precedents in this and other courts for an injunction to prevent interference with the carrying out of their duties. It was their obligation to seek continuously a remedy. Instead, they chose to act in concert with the union leaders.

■ Because of their adherence to the combination above referred to, the carriers did not use reasonable means or any means at all to carry out their duties. They did transport Wards' goods, other than goods destined for or sent from Wards' Portland establishment, in line-haul interstate and intrastate commerce, because the union leaders made this exception. But no attempt was made by any carrier to complete interstate transportation by carriage in the local area, as before noted, to a point in the vicinity of Wards' plant or to receive at some such point and transport thence. No attempt was made to use local agencies of transportation in the Portland area. The carriers made no attempt to have the local authorities control any threat of violence or assist them in the performance of their duties. Finally, no carrier attempted to clear up any part of the situation by legal action, which certainly was available to each of them. The carriers had no controversy with Wards. On the other hand, none of them had any unity of interest with Wards. As to the carriers, no labor dispute existed because of the situation at Wards, even under the broad terms of the Oregon Labor Act, ORS 651.010 et seq. or the Norris-La Guardia Act.

It has been seen that all the defenses attempted on legal grounds are evanescent. The remainder of the answers of the carriers are based upon pragmatic hypothesis. The course of their argument deserts legal theory and is built on postulates of fact.

If they had issued directives to their own respective employees requiring them to carry out their obligations, they say the orders would not have been obeyed.[88] If discharges had then been

---

87. The following cases show that carriers may enjoin interference by strikers with the performance of their duties: Smotherman v. United States, 10 Cir., 1950, 186 F.2d 676; Louisville & N. R. Co. v. Local Union No. 432 of International Woodworkers of America, D.C.1952, 104 F. Supp. 748; Illinois Central R. Co. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Union Local 568, D.C., 1950, 90 F.Supp. 640; Stewart v. State, 1953, 221 Ark. 496, 254 S.W.2d 55; Millmen Union Local 324, A. F. of L. v. Missouri-Kansas-Texas R. Co. of Texas, Tex.Civ. App., 1952, 253 S.W.2d 450; Terminal R. Ass'n of St. Louis v. International Ass'n of Machinists, 1948, 333 Ill.App. 288, 77 N.E.2d 448; Northwestern Pacific R. Co. v. Lumber & Sawmill Workers' Union, United Brotherhood of Carpenters & Joiners, 1948, 31 Cal.2d 441, 189 P.2d 277; Burlington Transp. Co. v. Hathaway, 234 Iowa 135, 12 N.W.2d 167, 149 A.L.R. 1238. This list of cases is illustrative and does not attempt to exhaust the field either for or against. However, an injunction will be refused when it appears that the picket line does not in fact interfere with the operation of the railroad, and that the "result comes about only because the railroad's own employees, over whom it presumably has control, are refusing to cross the picket line." Missouri Pacific R. Co. v. United Brick & Clay Workers Union, Local No. 602, 1951, 218 Ark. 707, 238 S.W.2d 945, 946.

88. Speaking of the refusal of the employees to handle the business of customers involved in labor disputes, the Court says: "To approve such a practice would to that extent oust the employer company from control of its own business and to that extent would prevent it from

issued, the men would have walked off the job. If the employees had persisted, boycott picket lines would have been set up at their own plants and at the business houses which dealt with them. The same result would have been occasioned if the carriers had attempted to transport Wards' goods in the local area, even in the course of an interstate journey, or to handle them, except in line-haul or surreptitiously.

■■ Of course, none of these things happened. The Court finds as a fact that, if the carriers had taken the action postulated, the results forecast would not have followed. But the carriers argue that the final consequences of such directives would have been that all traffic, interstate, intrastate and local, in the Portland area would have ceased, to the great detriment of all people in the locality and all business houses in the area. Inter-state commerce would have been thrown out of alignment. And most important, the national government, then in the penumbra of major war, would have been embarrassed in its operations.

■■ Of course, the fact that the assumed consequences were all illegal does not affect the smooth-flowing argument.[89] Nor does the fact that the cooperation of the carriers was itself illegal and in violation of the basic principles upon which they hold sovereign powers deflect the stream. The answer is that each must have surrendered its franchise as a public office before yielding.

■■ It is said, one of the principles binding upon all members of the laboring class is that none shall cross a picket line. Such a theory is far too broad and is not even observed by the most idealistic union men themselves.[90]

performing duties to the public required by law." Western Union Telegraph Co. v. American Communications Ass'n C. I. O., 1949, 299 New York 177, 86 N.E.2d 162, 168. The carrier's duty is comparable to that of an owner of a vessel required "to safely transport the cargo", and either could discharge employees who would fail to carry out that duty. Peninsular & Occidental S.S. Co. v. National Labor Relations Board, 5 Cir., 1938, 98 F.2d 411, 414, certiorari denied 1938, 305 U.S. 653, 59 S.Ct. 248, 83 L.Ed. 423. "While these employees had the undoubted right to go on a strike and quit their employment, they could not continue to work and remain at their positions, accept the wages paid to them, and at the same time select what part of their allotted tasks they cared to perform of their own volition, or refuse openly or secretly, to the employer's damage, to do other work." National Labor Relations Board v. Montgomery Ward & Co., Inc., 8 Cir., 1946, 157 F.2d 486, 496. "* * * employees sought and intended to continue work upon their own notion of the terms which should prevail." C. G. Conn, Limited, v. National Labor Relations Board, 7 Cir., 1939, 108 F.2d 390, 397. See also National Labor Relations Board v. Mt. Clemens Pottery Co., 6 Cir., 1945, 147 F.2d 262; Home Beneficial Life Insurance Co., Inc. v. National Labor Relations Board, 4 Cir., 1947, 159 F.2d 280, certiorari denied, 1947, 332 U.S. 758, 68 S.Ct. 58, 92 L.Ed.

344; New York State Labor Relations Board v. Union Club of City of New York, 1944, 268 App.Div. 516, 52 N.Y.S.2d 74.

89. The "strike" here would have been illegal, since it would tie up all traffic in the Portland area at a critical time, United States v. United Mine Workers of America, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884. Therefore, such a strike would not be beyond the national power of control.

90. An employee may not refuse to cross a picket line in the course of his employment. National Labor Relations Board v. Rockaway News Supply Co., Inc., 2 Cir., 1952, 197 F.2d 111, affirmed 1953, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832. Certain unions accept contractual clauses which admit that picket lines need not always be respected. "Collusive picket lines, jurisdictional picket lines, hot cargo picket lines, secondary boycott picket lines, and demonstration picket lines are not legitimate and bona fide picket lines within the meaning of this Agreement." ("* * * page F. of the Special Supplement to The Dispatcher * * * November 9, 1951, * * *.") But, as the National Labor Relations Board officer in Charge in Hawaii is reported to have said, "They mean nothing to people who believe a contract is a scrap of paper—a truce in a Class War. * * * Aside from the attitude that a contract is only a truce in a Class War, there will always be men who will refuse to

**516**

It is recognized by writers on the subject that certain picket lines are illegal, even those established by one's own union. A picket line set up to force an employer to perform an act he is bound by law not to do is not entitled to respect by a union member.[91] If a picket line were set up which interfered with the carrier in the performance of duties obligatory by federal statute, no one could be bound to refrain from crossing it. While, as a citizen, a union man is perfectly free to follow his own impulses, when on duty during working hours he personally must respect the duty of his employer, whom he represents. It would probably be illegal for the rail carriers to write a general stipulation not to cross any picket line into their employment contracts.[92] And there is no evidence here they did so. The very reason the rail employees are under the Railway Labor Board is because of respect for the peculiar obligations of the carriers.

■ There is evidence the Teamsters Union first induced by pressure [93] such a construction to be placed upon a contract which did not contain any such language, and thereafter persuaded the motor carriers to write an express stipulation into the new contract, limiting respect to lines of A.F. of L. unions.[94] Simply because the motor carrier employees are under another administrative board does not change the obligations of the carriers. And such a provision in a contract between the motor carriers and their employees is no justification for the failure of the carriers to serve Wards.

■ But it is said the employees themselves were sympathetic, and, impelled by fraternal feeling, would not interfere with employees of other concerns who were striking to protect the rights of the class.[95] It may be, but the Teamster executives made it plain they would have a driver put out of the union if he handled Wards' freight, which was classified as "hot." This was the most severe sort of pressure, since he could not, as a non-union driver, get a job elsewhere in

---

cross a picket line when their best manly instincts tell them it is dishonorable and disreputable to help break a worthy strike." For an excellent discussion of these matters, See Brissenden, "The 'Three Clauses' in Hawaiian Labor Agreements," Vol. LXVIII, Pol. Sc. Quar. 89 (1953). But all this is inapplicable where a carrier is involved.

91. See Peters v. Central Labor Council, 1946, 179 Or. 1, 169 P.2d 870.

92. A collective bargaining agreement "which tends to restrict the free and general use of telegraph lines and the public service those facilities afford is invalid." In the Matter of the Western Union Telegraph Co., 1949, 299 N.Y. 177, 187, 86 N.E.2d 162, 168. A contract with the union representing its employees cannot relieve a carrier from performing its duties, even when threatened with strike. Chatas & Nicol v. Silver Wheel Motor Freight, Inc., P.U.S. Order # 5054, November 19, 1937. Loader v. Brooklyn Heights R. Co., 1895, 14 Misc. 208, 35 N.Y.S. 996.

93. "Scudder [Counsel and Secretary of the Truck Operators League of Oregon] pointed out many times to Schlaht [Secretary of Teamsters Local 162] that the labor contracts (non-interference with service clause) prohibited the union truck drivers from refusing to go through the line. Schlaht told Scudder "He didn't give a damn what it was or how it read; he just wasn't going to have men going through the picket line." P.T.O. 338.

94. Five trucking companies were sued together with the union for an injunction and damages. The Supreme Court of Texas upheld a temporary injunction against them, notwithstanding the fact that each trucking company had a contract with the transport union defendant not to " 'request, instruct or require (their) employees to go through a picket line of a striking union.' " Best Motor Lines v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local No. 745, 1951, 150 Tex. 95, 237 S.W.2d 589, 590; Burgess Bros. Co., Inc. v. Stewart, 1920, 112 Misc. 347, 184 N.Y.S. 199.

95. The right of labor under the Wagner Act to assist labor organization, to engage in concerted activities, and to strike, is not without limitation. "The conduct thus protected is lawful conduct." National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 255, 59 S.Ct. 490, 496, 83 L.Ed. 627.

the industry.[96] The employees of Terminal Company responded under direction of one of their union executives, who did not want to get in trouble with the Teamsters.

The ritualistic recognition of a "picket line" under all circumstances by common carriers because of union pressure lays the foundation for a general strike and class war. If the Court appraises correctly the public interest and the feeling of the great majority of union men themselves, these developments would not be in accord with our history and would destroy the gain which labor has made. Yet in this very situation were all the elements necessary to provoke illegally a general strike, which this country, for all its liberality toward labor, has avoided as anarchy. The insistence upon the paramount obligation of an employee to some distant union, irrespective of law or morality, is the basis of the Marxian conflict of classes. It has no place in the American way of life.

However, this was not a rank-and-file decision, but a "labor boss" decision to cut off Wards from "fire, food and water." No sincere friend of labor or an uncontrolled advocate of the rights of the rank and file ever desires to elevate the labor boss to the place where he can control foreign policy, domestic policy or dictate what businesses shall or shall not survive.

As a matter of fact, the powerful Teamsters' executives carried out the isolation of Wards by utterly illegal weapons, threats to the members of transport unions, menacing suggestions of boycott of everyone who dealt with Wards [97] or with anyone who dealt with anyone who dealt with Wards, by breach of their own contracts with the motor carriers, with threats of violence and sufficient violence to scare off sympathetic railroad men disloyal to their own employers but not sufficient riots or overt acts for Wards to invoke the Norris-La Guardia Act.

Whatever motivated the carriers, the actions above recited were deliberate and were in furtherance of the unlawful design and reasonably calculated. The carriers had legal excuse to stand their ground and attempt to carry out their obligations. If a strike of their own employees occurred, they would still be under obligation to use all means within their power to attempt to receive, transport and deliver to Wards. This obligation could then have been enforced against the carriers even in a strike of their own employees, by mandamus, injunction, receivership or governmental protective custody.

The Court is of the opinion that the carriers were not insensible of the fact that their actions in concert with the union leaders were illegal, but that they feared action in the courts would have caused them to be tied up so that they could not operate. They attempted to use a sort of informal "balance of convenience."[98] They determined it would be less of an evil if Wards were discriminated against than if the Portland area were closed to traffic, since business and the government would then suffer also. This argument is not entirely disingenuous. The carriers feared seizure

96. " * * * expulsion from the union may be virtually economic excommunication." Tobriner, A New Concept of Labor Law, 27 Cal.Bar J. 414 (1952).

97. Estabrook, Executive Secretary of Local 206 of the Teamsters Union, stated to them (the motor carriers) that, if they handled any Montgomery Ward freight, he would tie them up all over their systems. P.T.O. 341.

98. "Steamship owners were at the mercy of the labor unions, and they felt, no doubt, that it was more profitable to tolerate, and, in fact, to openly countenance, the unjust and illegal acts of the unions, than to discourage those of their employees who refused to handle plaintiff's lumber." Burgess Bros. Co., Inc. v. Stewart, 1921, 114 Misc. 673, 187 N.Y.S. 873, 876. The court went on to say that the carrier acted "on the theory, no doubt, that it was better that plaintiff should suffer than that the movement of freight in the port be 'tied up.' " 187 N.Y.S. at page 877.

by the government in the event of war.[99] And, in any event, they feared bankruptcy if there were a prolonged tie-up. Self-interest was, of course, the dominating motive.

However, the situation was not correctly appraised by them. Some of the unions involved had been severely disciplined not long before by the public in this state.[100] Anything which brought the opinion of the people to bear upon them would have caused them to withdraw from indefensible and illegal positions. The evidence in this case proves the point. The unions took away the picket lines from the freight depots after these had been set up. When the proceedings were heard before the examiner of the Commission, the strike evaporated and was lost, for public opinion was brought to bear.

▪ In any event, it was the duty of the carrier to stand a strike or surrender up its operating franchise before joining in a conspiracy to destroy a business house with which they had no quarrel. If bankruptcy had been the result, then such is often the case where one attempts to fulfill one's legal duties and responsibilities.[101]

It is a shocking thing that, as shown by the record, members of an executive department of the government at that time cooperated with the union leaders in the attempt to destroy an independent business house.[102] This attitude the carriers may have taken as a warning that they had better act in concert with the leaders or they might have trouble with their own labor and be seized in reprisal. It might have been that.

The carriers violated their obligations by boycotting Wards and cutting it off from access to the facilities of commerce in order to stay in business themselves. It is only just that they should pay the damage to Wards.[103]

▪ The answer which has the most merit as an explanation of the conduct of the agencies of the government and

99. A list of seizures by the government of industrial properties, including railroads, may be found in Youngstown Sheet & Tube Co. v. Sawyer, 1952, 343 U.S. 579, 614, 72 S.Ct. 863, 96 L.Ed. 1153.

100. See Note 39, supra.

101. "No temporary inconveniences to the defendant company, or the public whom it serves are * * * for one moment to be compared with the fatal consequences which must ensue from a precedent by which it would be established that a railway company may, in violation of the law of the land, refuse to receive and haul * * * at the command of any irresponsible persons, or from its own belief and apprehension that its employes will leave its service, and stop the operation of its lines." Chicago B. & Q. Ry. Co. v. Burlington C. R. & N. Ry. Co., C.C., 1888, 34 F. 481, 484. "* * * even though it may have led to a great financial loss * * * and inconvenience to the public." Burgess Bros. Co., Inc. v. Stewart, 1921, 114 Misc. 673, 187 N.Y.S. 873, 877. "* * * no immunity because the employer may think that the exigencies of the moment require infraction of the statute." National Labor Relations Board v. Star Publishing Co., 9 Cir., 1938, 97 F.2d 465, 470. Economic coercion or necessity is no justification. National Labor Relations Board v. Gluek Brewing Co., 8 Cir., 1944, 144 F.2d 847, 853; National Labor Relations Board v. National Broadcasting Co., Inc., 2 Cir., 1945, 150 F.2d 895, 900; National Labor Relations Board v. Newspaper & Mail Deliverers' Union of New York and Vicinity, 2 Cir., 1951, 192 F.2d 654.

102. On April 26, 1941, the Postmaster of Portland wrote to Wards as follows: "We have this date been informed by the Post Office Department that additional service beyond that ordinarily provided Montgomery Ward during normal times is not authorized * * *." P.T.O., p. 396. The motor carrier defendants contacted a representative of the Interstate Commerce Commission, and "described to him the motor carrier contracts and asked him to bring some pressure on the unions to cease interference with the motor carriers. To this the Interstate Commerce Commission representative replied, "Well its a labor dispute and we cannot take sides." P.T.O., p. 339.

103. "Certainly, the question of rendering switching service by a carrier is not to be determined by the grace of the Union which is on strike in one of the industries that the railway company under the law is required to serve. * * *

the rail carriers and the motor carriers was the existence of a national emergency before and during the time of strike, which came to crisis December 7, 1941. This Court had expressly recognized the gravity of the situation long before the strike commenced.[104] As far as the carriers were concerned, the Court recognizes their fears and dangers. The country was at war, and the government was insisting that there be no stoppage. Whether for the government or the railroads, this must be seriously considered. But, if valid then, it has no validity now. The carriers and, in particular, the railroads were faced then with a threat of seizure. For their own purposes and with the same motives, all defendants allowed Wards to carry the economic burden alone, while their duty called upon them to serve. Since some carriers survived and were not then seized, they should pay for the natural and probable consequences of having failed in their duty. If it be assumed that this action was proper in the extreme emergency, it was still a violation of law and, when the emergency is passed, must be compensated to those injured thereby.

All defendants are liable.[105]

---

But surely we have not reached a situation in this country where a common carrier must capitulate abjectly when a striking Union merely makes known to it that it desires that the carrier refrain from rendering such service. \* \* \* Instead of attempting to obey the law of the land, the defendant assumed to consider the wishes and the demands of the striking Union as being paramount. To condone defendant's failure to perform its statutory duty under this evidence would be tantamount to recognition that mob rule had supplanted law and order in this community." Pacific Gamble Robinson Co. v. Minneapolis & St. Louis Railway Co., D.C.1952, 105 F.Supp. 794, 802.

104. "The situation of this country will be judged by the law of nations, but whether events prove we are at war, in a state of war, or clinging to an equivocal neutrality, a failure to register manpower of the country would be a failure to provide for 'the common defense'." Stone v. Christensen, D.C., 1940, 36 F.Supp. 739, 743.

105. It is remarkable with what tenacity the courts have clung to the bulwark of the common law obligations of carriers in the public interest, notwithstanding the overwhelming tides of interest in the rights of labor. The continuous procession of the decisions awarding relief against the carrier, as shown by the dates and marked by the constancy of the holdings, answers to some deep seated feeling of the people that economic stability depends thereon: Chicago B. & Q. Railway Co. v. Burlington C. R. & N. Railway Co., C.C.S.D.Iowa, 1888, 34 F. 481, injunction; Toledo A. A. & N. M. Ry. Co. v. Pennsylvania Co., C.C.N.D. Ohio, 1893, 54 F. 730, 19 L.R.A. 387, injunction; Id., C.C.N.D.Ohio, 54 F. 746, 19 L.R.A. 395, injunction; In re Lennon, 1897, 166 U.S. 548, 17 S.Ct. 658, 41 L.Ed. 1110, injunction; Burgess Bros. Co. Inc., v. Stewart, 1920, 112 Misc. 347, 184 N.Y.S. 199; Id., 1921, 114 Misc. 673, 187 N.Y.S. 873, injunction; Buyer v. Guillan, 2 Cir., 1921, 271 F. 65, injunction; Hicks v. Bekins Moving & Storage Co., 9 Cir., 1937, 87 F.2d 583, damages; Consolidated Freight Lines, Inc. v. Department of Public Service 1939, 200 Wash. 659, 94 P.2d 484, order suspending operating permit unless carrier served strike-bound customer affirmed; Pacific Gamble Robinson Co. v. Minneapolis & St. Louis Railway Co., D.C.Minn.1949, 83 F.Supp. 860, injunction; Best Motor Lines v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local No. 745, 1951, 150 Tex. 95, 237 S.W.2d 589, injunction; Pacific Gamble Robinson Co. v. Minneapolis & St. Louis Railway Co., D.C.Minn.1952, 105 F.Supp. 794, damages. Again, this list is not exhaustive.